Frederick Backer, J.
 

 This case was tried before the court and a jury. Plaintiff sued to recover the sum of $37,222 paid by the defendant to one Anlyan, on or about October 17, 1951, pursuant to cable instructions from the Bank of Italy at Milan, Italy, to the defendant. Plaintiff claims the money should have been paid to it, instead of to Anlyan. In substance, the background of the negotiations was as follows: In September of 1951, an Italian entity, known as Garmoja, entered into an arrangement in Italy with Sicca Dante Corti, another Italian entity (hereinafter called Corti), pursuant to which Garmoja paid 23,310,000 lire to Crédito-Lombardo, an Italian bank, for the account of Corti, and Corti then instructed Credito-Lombardo to transmit $37,222 to said Anlyan, who, in advance of such transfer, was to assign said sum of $37,222 to plaintiff, and plaintiff, upon receipt of said amount, was to hold it for Garmoja. The evidence established that Anlyan did, in advance of such transfer, assign said $37,222 to plaintiff and that plaintiff in turn notified defendant of such assignment, and that defendant promised to pay such amount to plaintiff but that defendant nonetheless paid same to Anlyan.
 

 Nine separate causes of action were pleaded by plaintiff, to which the answer of defendant presented triable issues. Defendant’s answer raised the specific affirmative defense that the arrangement between Garmoja and Corti was an agreement for the purchase and sale of dollar exchange, and as such was a violation of the foreign exchange control laws of Italy; and further, that such agreement and the attempted transfer of such funds, pursuant to such agreement, by Anlyan to plaintiff are contrary to the public policy of the United States and the State of New York and as such unenforcible by our courts.
 

 The factual issues were duly tried and the jury rendered its verdict in favor of the plaintiff. At the close of the entire case decision was reserved on defendant’s motion to dismiss the complaint and for a directed verdict, as a matter of law. Decision also was reserved on plaintiff’s motion to dismiss the affirmative defense. There now awaits my determination of the legal facet of the trial, viz., whether or not defendant’s affirmative defense of the Italian law is a complete bar to plaintiff’s recovery as a matter of law. Resolution of this legal issue is not an easy task, since the factual and legal problems posed are out of the ordinary and there is a dearth of case law similar in factual detail. However, the court’s study has been fortified by and
 
 *399
 
 has had the benefit of able research and presentment on the part of respective counsel for which the court extends its commendation.
 

 By section 344-a of the Civil Practice Act it is incumbent upon the court to determine the law of Italy as it affects the facts in this case. The court has taken judicial notice of the relevant, applicable laws of Italy. Under the law of Italy, as it existed from 1934 to date, no transactions in foreign exchang; could or can be effected unless duly licensed by the Italian Government; licenses permitting a transaction in foreign exchanges other than those relating to the needs of Italian citizens for trips abroad, must be based upon either the export or import of goods from or to Italy; the amount of foreign exchange authorized for any particular transaction must be stated in the license authorizing the Import or export of the goods involved; and these licenses may be used only in connection with the import or export of goods for which they were granted and only by the person to whom they were granted. These prohibitions are contained in the following laws-of Italy: (1) the Royal Decree Law of September 29,1931, No. 1207; (2) the Ministerial Decree of May 26,1934; (3) the Ministerial Decree of December 8, 1934; (4) the Royal Decree Law of May 12, 1938, No. 794; (5) the Royal Decree Law of December 5, 1938, No. 1928; (6) the Ministerial Decree of March 5, 1949.
 

 Pursuant to the Boyal Decree Law of May 12, 1938, No. 794, an Advisory Board was established which ruled, in an opinion dated June 6,1939, Opinion No. 4158, that: “ Payment of Lire in Italy, to correspond to a payment in foreign currency abroad, not made pursuant to license, is a violation of the provisions of Article 1 of the Ministerial Decree of May 26,1934 and of Article 9 of the Ministerial Decree of December 8, 1934.” The same Advisory Board also rendered an opinion on July 31, 1939, Opinion No. 4266, which stated that:
 
 “
 
 Whoever accepts, in Italy, lire to correspond to a transfer of foreign exchange abroad violates Article 1 of the Ministerial Decree of May 26, 1934 and Article 9 of the Ministerial Decree of December 8,1934.”
 

 Defendant’s expert, Dr. Bava, gave learned and impressive testimony on these controlling Italian laws, decrees and Advisory Board opinions, as well as upon applicable and controlling decisional law of the courts. He testified that the transactions here involved constituted a violation of the Italian law, as also was the assignment to Anlyan, and that the entire transaction and attempted transfer was illegal, void and unenforcible in Italy. In support of his expert opinion, Dr. Bava cited and
 
 *400
 
 discussed ti e afore-stated Italian Decree Laws, the two Advisory Board opink as and also the following cases:
 
 Societa’ La Ferraglia
 
 v.
 
 American Commercial Company
 
 (Foro Italiano, 1951, No 1, p. 536, decided by the Supreme Court of Italy, April 14, 1951);
 
 Societa’ Thea Impex
 
 v.
 
 Unger
 
 (Foro Italiano, 1951, No. 1, p. 536, 40 Italiano Reportorio, p. 299 [Temi Genovese 1952, p. 199], decided by the Court of Genoa on December 15, 1951).
 

 Studying the pertinent provisions of the afore-mentioned Decree Laws, we find they read as follows:
 

 “ The Decree Law of May 26, 1934.
 

 “1. Only operations in foreign currency or exchange pertinent to the real needs of industry or commerce or covering the needs of the person travelling abroad may be executed.
 

 “ Such needs must be evidenced by original documents. Operations covering needs of persons residing abroad whose assets are within the kingdom, its colonies or possessions may be executed.
 

 1 ‘
 
 2. When the operation is executed, the party furnishing the foreign currency must affix a stamp on the evidencing documents which indicates the amount of exchange transferred.
 

 “ 3. Banks, bankers, exchange brokers and in general, associations, companies and entities which have their own domestic or foreign accounts in foreign currency must notify the Banca d’Italia of the balances of said accounts.
 

 “ Said notice must be given within fifteen days of the date of publication of this decree for the balances existing as of the date of the report, and successively, every ten days, by banks, bankers, exchange brokers, not later than five days after the end of the ten day period, and every month by associations, companies and entities, not later than ten days after the end of the month.
 

 “
 
 4. From the date of publication of this decree, banks, bankers, exchange brokers, associations, companies, entities and Italian citizens residing or domiciled in the kingdom, its colonies and possessions, are prohibited from purchasing valuables and securities in foreign markets, whether said purchases are made for their own account or for account of third parties, and whether said valuables and securities are foreign or Italian ones issued abroad.
 

 “ For those securities even if they are physically deposited abroad and were owned as indicated above prior to the date of publication of this decree, proof of such prior possession shall be evidenced by the stamp and on the receipt for payment of
 
 *401
 
 the stamp tax under the terms of the royal decree-law no. 804 of May 26,1934.
 

 * * *
 

 “ 6. The terms of this decree also apply to payments in lire to be made in favor of a foreign party, whether by a credit in account or a transfer.
 

 * *
 

 “ 14. Without prejudice to the greater penalties imposed by the common laws and by art. 3 of royal decree-law no. 1207 of September 29, 1931 persons violating the terms of this decree shall be subject to the fines which the Minister of Finance is authorized to impose up to an amount equivalent to the value of the securities and foreign currency involved in the violation.
 

 “ In the case of associations and companies, the penalties shall be imposed even on the president, delegate director and auditors, as well as on the officers and employees who by their personal action made the operation possible or so handled it as to hinder the knowledge of its true nature.
 

 “Whether the transgressors are private individuals or companies, the above mentioned penalties shall be applicable to the principals, to those directly interested in the operation, as well as the employees acting in the manner described in the previous paragraph.
 

 “All those persons who in any way took part in the operations not approved by this decree shall be likewise subject to the penalties set forth in this article.
 

 “ The Minister of Finance shall use all the means at his disposal to conduct the necessary studies and investigations to assure the exact application of the terms of this decree which shall become effective on the date of its publication in the Official Gazette of the kingdom.”
 

 The Decree Law of December 8,1934.
 

 “ 9. Only the Exchange Office may trade the means used for payments outside Italy.
 

 “ The purchase of foreign exchange, foreign drafts, banknotes and treasury notes, the utilization of any other means of payment outside Italy, the realization of foreign securities abroad, and Italian securities issued abroad, and the collection of their relative coupons are effected exclusively by the same office.
 

 “ The exporting of foreign securities or Italian securities issued abroad may not be effected without a permit from the Exchange Office.”
 

 
 *402
 
 The Decree Law of May 12, 1938.
 

 “ 1. — The Instituto nazionale per i cambi con 1’estero (National Foreign Exchange Office) has the control and supervision over the due observance of prevailing regulations in matters of exchange with foreign countries, payments and collections outside the kingdom, exchange trade, the compulsory transfer and reporting of credits abroad, and of Italian securities issued abroad, transfer to foreigners of organizations or participation in foreign enterprises, control of the gold trade and monopoly of purchases abroad of gold, and other matters covered in the second and third paragraphs of article 2 of decree no. 643 of March 14, 1938.
 

 “6. — Under the ministry for foreign exchange and currency, a consultative commission is established for the purpose of expressing its opinion on the infractions detailed in article 2 of decree no. 643 of March 14, 1938, and article 1 of the present decree.
 

 “■
 
 The commission consists of a president and four members, appointed every two years by decree of the minister for foreign exchange and currency, who also appoints a secretary for the commission for the same term of office.
 

 ‘6 The secretary is assisted by the personnel on the payrolls of the ministry for foreign exchange and currency and/of the Instituto nazionale per i cambi con 1’estero.
 

 “A majority of its members must be present for the commission to legally hold a meeting and decisions are reached by a majority vote. In case of tie, the president has the deciding vote.”
 

 The Decree Law of December 5, 1938.
 

 “
 
 2. Without prejudice to the penalties established by other legislative rules, the minister of exchange and foreign currency is authorized to impose on transgressors, by his own decree, fines for a sum not exceeding five times the value of the foreign exchange, securities, merchandise, etc. involved in the violation.
 

 ‘ ‘ The same fine may be levied on whoever performs- qualified acts unequivocally intended for the purpose of violating one of the terms of the preceding* article, and on any person assisting in the commission of one- of said violations, or hindering investigation thereof.”
 

 The Decree Law of March 5, 1949.
 

 ‘ ‘ 1. Private compensation transactions are authorized with permits issued by the Italian Exchange Office, on the instructions of the Minister of Foreign Trade.”
 

 
 *403
 
 In
 
 La Ferraglia
 
 v.
 
 American Commercial Company,
 
 (Sup. Ct. of Italy,
 
 supra)
 
 the facts were as follows: Two Italian firms entered into an agreement in Italy for the purchase and sale of merchandise located in France. Payment was to be made in “free” United States dollars which the purchaser of the goods had on deposit with a Swiss bank. That dollar credit was lawfully owned by the purchaser as a result of a previous legal export transaction. Presumably the terms of the agreement were not carried out, and the seller sued to recover the purchase price. The buyer raised the question of the illegality of the transaction and that defense was sustained by the Supreme Court and it should be noted that the defendant in that case made the very same argument that the plaintiff is making in this ease. In so holding, the Supreme Court of Italy said:
 

 “ Ferraglia’s first ground of appeal consists of two parts. * * *
 

 “ In the second part it is stated that the agreement to pay 4 free ’ dollars is not void because the law does not forbid the trade in foreign currency between Italian firms, in Italy.
 

 “ And this is so true that the Decree of the Regent, March 26, 1946, No. 139, allows the exportation of merchandise from Italy, provided that half of the so obtained foreign currency will be transferred to the State.
 

 “ Moreover, Article 1278 of the Italian Civil Code provides that whoever is the debtor of a sum of money of a currency which is not the official currency of the State is allowed to satisfy his obligation with the then official currency of the State. * * *
 

 4 4 With regard to the assumed validity of the agreement to pay with 4 Free dollars on a Swiss Bank ’ on the basis of Article 1278 of the Civil Code and of the Decree of March 26,1946, No. 139, it will be sufficient to point out, without even taking into consideration the difference existing between 4 Export Dollars ’ and 4 Free Dollars ’, and the fact that the law allows the Italian importer to dispose of only one-half of the currency which he has received in payment, that the Decree, as well as Article 1278, does not consider an hypothesis like this one.
 

 “In this case a payment has to be effected abroad with foreign currency, of which the buyer should have had free power of disposal. * * *
 

 4 4 Ferraglia assumes, with his third ground for appeal, that the payment of 4 Free ’ dollars could not have resulted in the voidness of the contract in the first place, because violations in the field of foreign currency are punished only with pecuniary fees which are imposed by the Minister of the Treasury who
 
 *404
 
 thereby exercises an administrative power, and secondly, because, even assuming that this particular clause of the contract will be considered void, it does not follow that the whole contract is void.
 

 “ But such arguments are not well taken.
 

 “ It will be clear from the reasoning this Court followed while examining the first ground of appeal, that the payment by Ferraglia of ‘ Free ’ dollars on a Swiss Bank is infringing imperative rules which cannot be derogated by private transactions.
 

 “ Therefore, it is now almost useless to recall, it being quite obvious, that a contract which infringes imperative legal provisions is void (Article 1418 Civil Code).
 

 “ The plaintiff (Ferraglia) quotes the decision of this Court of July 16, 1946, No. 892 (Foro Italiano 1947, 1-376) according to which, if a legal provision sets forth only pecuniary and disciplinary sanctions for its violation, the further and more severe sanction of the voidness of the contract, or of one of its infringing clauses, should be deemed to be implicitly excluded.
 

 ‘ ‘ The quotation is correct but, should the principle, which in that case the Court sets forth, be considered as having a general meaning so as to be applied to all cases, it could not be accepted, (in fact it was a very particular case so that not even the
 
 1
 
 massima ’ was written).
 

 “When there is an imperative legal provision and a legal transaction violates it, the
 
 poena adi ecta.
 
 (additional sanctions) of a fee or a disciplinary measure does not exclude the voidness of the contract.
 

 “ Article 1418 of the Civil Code, First Paragraph, sets forth a rule
 
 (‘
 
 The contract which infringes imperative legal provisions is void ’), and an exception thereof (‘ except in the case when law otherwise provides’).
 

 “ This means that, if the legal provision does not provide otherwise, the contract violating imperative legal provisions is void even if such voidness is not explicitly provided for (see: Report of the Minister of Justice No. 649).
 

 “ It follows that the existence of a pecuniary or disciplinary sanction which can be provided for as sole sanction, but also only in order to add in strength to the command of the law which imposes or forbids, has no bearing.
 

 “ It is always necessary to ascertain whether or not the contract infringes an imperative legal provision, and the voidness of the contract is an inescapable consequence thereof if the violation exists.
 

 “ Not even the other thesis, according to which, on the basis of the second paragraph of Article 1419 Civil Code, and of
 
 *405
 
 previous decisions of this Court (August 26, 1946 No. 1266 in Foro Italiano 1947, 1-194) only the clause referring to the payment, and not the whole contract, would he void, can be accepted.
 

 “In the first place, the hypothesis taken into consideration by the second paragraph of Article 1419, i.e. the validity of the contract notwithstanding the voidness of some of its clauses which are automatically replaced by imperative legal provisions, is not the one of this case.
 

 “ The imperative legal provisions which should automatically take the place of the void clauses does not, in fact, exist.
 

 “ The first paragraph of Article 1419 Civil Code, on the contrary, very clearly frames an hypothesis such as the one of the present case.
 

 ‘ ‘ As the lower Judge has established, the clause by which a payment of 1 free ’ dollars had to be made on a Swiss Bank, was an essential clause of the contract: It was necessary, in fact,- to American Co. that the payment was performed in such a way in order to be able to pay the Belgian corporation which owned the merchandise and was the real seller.
 

 1 ‘
 
 Ferraglia had agreed on this clause.
 

 “Finally, the decision of August 26, 1946 No. 1266, is not relevant to this case.
 

 “ It was held that the legal provisions which limit the freedom of commerce in foreign currency do not provide the voidness of the obligation to pay such currencies within the country (Italy), but only affect the way in which the payment has to be made, providing that such payment is performed in lire at the exchange rate of the day on which the money becomes due.
 

 “In this case the payment was to be made not within the country, but abroad, disregarding the clearing agreement and the legal provisions dealing with foreign currency.
 

 “ Therefore, the whole agreement based on such payment is radically void. (Omissis.) * *' *
 

 “ Therefore, the appeal is rejected.”
 

 In the case of
 
 Societa’ Thea Impex
 
 v.
 
 Unger
 
 (Court of Genoa,
 
 supra)
 
 the facts appeared as follows: A, a citizen of Italy, entered into an agreement with B, a citizen of Czechoslovakia, for the purchase by A of merchandise from B. The agreement provided that payment for the goods was to be made in United States dollars by C, a resident of New York. A in turn agreed to reimburse C by crediting his account in Italy with a sum of lire equivalent to the amount of dollars paid by C to B.
 

 In holding that such transaction was in violation of the foreign exchange laws of Italy and as such absolutely void
 
 *406
 
 and nnenforcible, the Genoa Court said: “As a result of government monopoly on foreign exchange existing in Italy, payments abroad cannot be made directly by private individuals or firms but must be made in accordance with an authorization of the Italian Exchange Office which provides for the opening of a credit with a foreign bank. These rules of law are imperative and a contract made in violation of them absolutely void. * * * Since it clearly appears that payment was to be made with dollars which were to be obtained as a result of a violation of the rules governing trade ill foreign exchange, imperative rules to which private agreements cannot make any exception, the contract under consideration was absolutely void.”
 

 With these pertinent authorities established, I find the testimony of Dr. Pavia, plaintiff’s expert on Italian law, quite illuminating and instructive, but not in any wise contravening or negating the law and decrees as proved by defendant. Dr. Pavia, while not disputing the stated authorities, said he had found an older
 
 case
 
 — Inac v. Giachetti, decided by the Supreme Court of Italy on July 16, 1946, wherein it was held that a contract made in violation of a Mussolini decree limiting the amount of compensation payable to film actors was nevertheless “ binding ”, and that he was
 
 “
 
 inclined to stick to the general principle expressed by the decision of 1946 ”. When confronted on cross-examination with the fact that the Supreme Court in the
 
 American Commercial Company
 
 case had expressly overruled, or, at least, had limited the 1946 case to the particular facts involved therein, Dr. Pavia merely responded that ‘£ I really cannot pay much attention to this observation by the court.” Moreover, he admitted that an assignment such as the one made herein to plaintiff would be illegal under Italian law. His testimony on this score bears repetition, as follows:
 

 ££ Q. Assume that Mr. Anlyan at Milan, Italy, in September of 1951, executed a letter to the National City Bank of New York in which he told the National City Bank of New York that he expected to receive from Italy $37,222 from an Italian bank, and that he wanted the National City Bank of New York upon receipt of those funds to pay them, not to him but to Southwestern Shipping Corporation. Now, further assume that Mr. Anlyan, while in Italy, takes that letter and hands it to an Italian citizen. Now I ask you: Does that violate the foreign exchange regulations of Italy? A. Not in itself.
 

 ££ Q„ I ask yon to please refer to —
 

 ££ The Court; I Would like to ask you this question: But these funds do not belong to Mr. Anlyan. Does that change your
 
 *407
 
 answer; that he is assigning, but they are in fact the funds ol an Italian citizen?
 

 “
 
 The Witness: Then we have to go into the background o± the transaction, which I do not know.
 

 ‘1Q. Let me ask you to please take into consideration in your answer the ministerial decree of December 8, 1934, Paragraph 9, which says: ‘ The power to transfer every credit which may be used to effect payments abroad is reserved to the National Office for Foreign Exchange.’ Have you taken that into consideration in your answer ? A. Yes, sir.
 

 “Q. Now, if Mr. Anlyan executes a transfer or an attempted transfer of funds, of foreign exchange funds, in Italy and delivers that in Italy, doesn’t that contravene the ministerial decree of December 8, 1934? A. Let’s see, Anlyan is a gentleman who —
 

 “ Q. He is in Italy. A. Let me see — who happens to be in Italy, a resident of New York or a resident of the United States, who knows — well, we have to go into the background — who knows that he is going to receive a certain sum of money.
 

 ‘ ‘
 
 Q. He hopes to receive it. A. He hopes to receive a certain amount of money from an Italian bank in dollars, and he writes a letter whereby he assigns that money to another American resident?
 

 “
 
 Q. No, to an Italian citizen and resident.
 
 *
 
 A. That he couldn’t do. He couldn’t assign it to an Italian resident.
 

 “ Q. That would be illegal, would it not? A. Then he would be selling American dollars in Italy.
 

 “Q. That is right; that is my point.”
 

 Pertinent to the foregoing and further emphasizing the illegality of the transaction is the fact that plaintiff admitted the transaction in question was nothing more than a purchase of exchange, pursuant to which Garmoja bought United States dollars from Corti and that the purchase of exchange is prohibited under the foreign exchange control laws of Italy.
 

 I am therefore convinced that the very form and essence of the transaction, including the fact that plaintiff was acting as agent for Garmoja in this transaction and that plaintiff was nothing more than an alter ego subsidiary for Garmoja, estab
 
 *408
 
 fishes that the entire transaction here involved was illegal, void and unenforcible in Italy.
 

 Plaintiff’s arguments seek to dissociate itself from the Garmoja-Corti agreement by asserting that it “ does not predicate its right to recover on the Garmoja-Corti agreement, but rather on plaintiff’s separate, distinct and entirely independent contract with the defendant, National City Bank.” Plaintiff, however, has not explained the nature of that contract or how it came into existence. Plaintiff, instead, has cited the Restatement of Contracts (§ 597); Williston on Contracts (vol. 6, § 1752); Corbin on Contracts (vol. 6, § 1531) and a number of cases, as authority for the following rule: “A bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction.” While neither defendant nor the court finds fault with this statement of law, it nevertheless is without any potency or relevancy here. Plaintiff has not established any facts which bring it within the purview of this stated rule. Plaintiff merely makes the broad assumption that its claim is based upon a contract which is only collateral to and remotely connected with the illegal assignment and the illegal Garmoja-Corti agreement, and then cites the afore-mentioned authorities. However, the sum total of evidence, in my opinion, conclusively and unequivocally establishes that plaintiff’s complaint and proof is predicated upon the assignment and the Garmoja-Corti agreement, both of which, as I have pointed out, are illegal by the laws of Italy. Studying the first cause of action, we find plaintiff alleges:
 
 “
 
 (3) That on or about the 16th and 17th day of October, 1951, at the City of New York, the defendant received the sum of $37,222 to the use of plaintiff, which said sum defendant promised to pay to plaintiff.” There is no evidence that defendant, on the 16th or 17th afore-stated, or at any time, received any sum of money to the use of plaintiff. The only evidence which could possibly relate to this allegation is that on or about October 16, 1951, defendant received cable instructions from the Bank of Italy to pay $37,222 to Anlyan. It follows, therefore, that unless the first alleged cause of action is based upon the so-called assignment by Anlyan to plaintiff, it must fail for lack of proof.
 

 In each of the remaining causes of action plaintiff alleges, in substance, that pursuant to an agreement entered into by and between residents of Italy, Anlyan assigned the moneys in question to plaintiff; that plaintiff presented said assignment to defendant; and that defendant promised plaintiff that upon
 
 *409
 
 receipt of a direction and order to pay said $37,222 to Anlyan it would pay same to plaintiff. Plaintiff, therefore, to prove its causes of action, was required to, and did, introduce into evidence the assignment from Anlyan to plaintiff. It also introduced into evidence a receipt from Crédito-Lombardo evidencing payment of 23,310,000 lire by Garmoja to Crédito-Lombardo from the account of Corti and evidence that said payment was made pursuant to the Garmoja-Corti agreement.
 

 In view of all this there is no question but that plaintiff’s claim is based upon the aforesaid illegal transactions, and not upon any separate, independent contract. Without proof of the assignment, plaintiff could have nothing upon which to predicate an alleged promise on the part of defendant to pay the money in question to plaintiff; and without proof of the payment of the 23,310,000 lire to Crédito-Lombardo for the account of Corti plaintiff would be unable to prove any damage on the part of its principal, Garmoja. Without this assignment, plaintiff could not establish a prima facie case. Since the assignment itself is predicated upon an illegal and void agreement, the assignment attained no greater rights. Plaintiff’s own proof showed that payment was made by Garmoja to Credito-Lombardo for the account of Corti of 23,310,000 lire and such payment was made pursuant to the illegal Garmoja-Corti agreement.
 

 Testimony of Mr. Fanelli (vice-president of plaintiff) established he knew of the Garmoja-Corti agreement soon after it was consummated. He also admitted that plaintiff was acting as agent for Garmoja in this transaction and that in any event, the $37,222 was not plaintiff’s money but was Garmoja’s. Mr. Garavaglia also testified that the money was Garmoja’s; that when the 23,310,000 lire was paid to Crédito-Lombardo, Garmoja expected to receive in exchange for it $37,222 from New York by way of plaintiff receiving the money here in New York and holding same for Garmoja. Mr. Garavaglia is an Italian citizen and president-treasurer of the plaintiff corporation. He is also its sole stockholder, since 1953. In September of 1951, the stockholders of plaintiff corporation were Garavaglia, Fanelli and Mojana, each owning one third of the capital stock.
 

 With these established facts in mind, our courts, under the Bretton Woods Agreement (60 U. S. Stat. 1401; U. S. Code, tit. 22, § 286
 
 et seq.),
 
 are expressly prohibited from furnishing any assistance to the enforcement of any agreements made in violation of the foreign exchange control laws of Italy. Paragraph (b) of section 2 of article VIII of the Bretton Woods Agreement provides as follows: “Exchange contracts which involve the currency of any member and which are contrary to the
 
 *410
 
 exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member.”
 

 The board of directors of the International Monetary Fund on August 18, 1949, issued an interpretation of the above-quoted paragraph (b) of section 2 of article VIII of the Bretton Woods Agreement, which provides in material part as follows:
 

 ‘£ The meaning and effect of this provision are as follows:
 

 “
 
 1. Parties entering into exchange contracts involving the currency of any member of the Fund and contrary to exchange control regulations of that member which are maintained or imposed consistently with the Fund Agreement will not receive the assistance of the judicial or administrative authorities of other members in obtaining the performance of such contracts. That is to say, the obligations of such contracts will not be implemented by the judicial or administrative authorities of member countries, for example, by decreeing performance of the contracts or by awarding damages for their non-performance.
 

 £ £ 2. By accepting the Fund Agreement, members have undertaken to make the principle mentioned above effectively part of their national law. This applies to all members, whether or not they have availed themselves of the transitional arrangements of Article XIV, section 2.
 

 “
 
 An obvious result of the foregoing undertaking is that if a party to an exchange contract of the kind referred to in Article VIII, section 2(b) seeks to enforce such a contract, the tribunal of the member country before which the proceedings are brought will not, on the ground that they are contrary to the public policy (ordre public) of the forum, refuse recognition of the exchange control regulations of the other member which are maintained or imposed consistently with the Fund Agreement. It also follows that such contracts will be treated as unenforceable notwithstanding that under the private international law of the forum, the law under which the foreign exchange control regulations are maintained or imposed is not the law which governs the exchange contract or its performance.”
 

 And the board of directors of the Fund have by letter dated August 8, 1957, addressed to the Secretary of the Treasury of the United States (defendant’s Exhibit V in evidence) determined that the six Italian decree laws upon which Dr. Rava based his opinion have, since Italy joined the Fund on March 27, 1947, and particularly during the year 1951, been maintained and imposed consistently with the Bretton Woods Agreement.
 

 
 *411
 
 Both the United States and Italy are parties to the Articles of Agreement of the International Monetary Fund (Bretton Woods Agreement), effective December 27, 1945. This agreement was accepted by the United States on December 20, 1945, and by Italy on March 27,1947.
 

 Even in the absence of the Bretton Woods Agreement, I must conclude that the cited authorities are determinative of the legal issue presented and that plaintiff cannot recover, as a matter of law, in a case such as this, if, as part of its ease, plaintiff is required to allege and prove an unlawful act. The rule is succinctly stated in
 
 Stone
 
 v.
 
 Freeman
 
 (298 N. Y. 268, 271) where the Court of Appeals said: “ It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose
 
 (Reiner
 
 v.
 
 North Amer. Newspaper Alliance,
 
 259 N. Y. 250;
 
 Municipal Metallic Bed Mfg. Corp.
 
 v.
 
 Dobbs,
 
 253 N. Y. 313, 316;
 
 Morgan Munitions Corp.
 
 v.
 
 Studebaker Corp.,
 
 226 N. Y. 94;
 
 Flegenheimer
 
 v.
 
 Brogan,
 
 284 N. Y. 268 ;
 
 Carmine
 
 v.
 
 Murphy,
 
 285 N. Y. 413;
 
 Furman
 
 v.
 
 Furman,
 
 287 N. Y. 772;
 
 Baksi
 
 v.
 
 Wallman,
 
 297 N. Y. 456). * * * Both
 
 Staples
 
 v.
 
 Gould (supra)
 
 [9 N. Y. 520] and
 
 Leonard
 
 v.
 
 Poole (supra)
 
 [114 N. Y. 371], say that a broker or agent who knowingly participates in a criminal scheme is a principal, and
 
 in pari delicto
 
 with the one who employs him, so that neither may sue the other. Such is the New York law and it disposes of this ease.”
 

 In Restatement of Contracts (§ 597 and comment b) it is stated that: “A bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction. * * * b. Even though a plaintiff’s case can be made out without indicating anything unlawful, it may be shown that the bargain is illegal because of facts not brought out in the plaintiff’s case, provided that the facts so offered show a close enough connection with an illegal transaction. The line of proximity varies somewhat according to the gravity of the evil apprehended. If the evil is serious a more remote connection with the illegal purpose or act is sufficient to invalidate the bargain than if the evil is slight.”
 

 (To the same effect see: Williston on Contracts, vol. 6, § 1753; Corbin on Contracts, vol. 6, § 1531; and
 
 Wood
 
 v.
 
 Hill
 
 [No. 2], 214 App. Div. 417 [1st Dept., 1925].)
 

 
 *412
 
 In view of all the foregoing, I am of the ultimate conclusion that the Garmoja-Corti agreement and the assignment are contrary to the exchange laws and control regulations of Italy, and as such were illegal and void.
 

 It is manifest, therefore, that the instant case falls squarely within the ambit of the stated rules, for plaintiff, as agent for Garmoja, is not only seeking the aid of this court to an objective which is illegal under the Italian law, but plaintiff has also pleaded and proved as a basis for its claim the illegal Garmoja-Corti agreement, the payment of Garmoja thereunder, and the illegal assignment by Anlyan to plaintiff. Cases in point are
 
 Gray
 
 v.
 
 Hook
 
 (4 N. Y. 449);
 
 Goodrich
 
 v.
 
 Houghton
 
 (134 N. Y. 115);
 
 Adler
 
 v.
 
 Zimmerman
 
 (233 N. Y. 431). In
 
 De Witt
 
 v.
 
 Brisbane
 
 (16 N. Y. 508) it was held that an assignment of a mortgage which was part of an illegal transaction was unenforcible because, by enforcing it, plaintiff would in effect be carrying out an illegal agreement. In holding the mortgage unenforcible, the court said: “ The familiar and well settled rule of law applicable to cases of this description is, that the court will not interfere to grant relief to either party. No court will lend its aid to a man who founds his action upon an illegal contract.”
 

 The cases relied upon by plaintiff are distinguishable and inapplicable here because, as hereinbefore pointed out, the facts established by the record here do not fall within the facts of the cases cited and, moreover, plaintiff’s case is predicated upon the illegal contract and illegal assignment.
 

 For all of the foregoing reasons and the applicable controlling law and decrees of Italy, it follows not only that defendant’s affirmative defense is valid, but it is insurmountable: While the jury has spoken as to the factual issues, I am nevertheless constrained to set aside the jury’s verdict and to grant defendant’s motion for a directed verdict on its affirmative defense as a matter of law. Plaintiff’s motion to dismiss the affirmative defense is denied.
 

 The clerk is directed to enter judgment accordingly in favor of the defendant against plaintiff.
 

 Thirty days’ stay of execution of judgment for costs and 60 days to make a case.
 

 *
 

 The so-called assignment, it will be recalled, instructed defendant to pay the moneys in question to plaintiff but as plaintiff was acting merely as agent for Garmoja the transfer of the funds in question was in fact and in law made to Garmoja. Note also that the hypothetical question put by defendant’s counsel to Dr. Pavia assumed, which is in accordance with the undisputed facts, that the assignment was delivered in Italy to Garmoja.