**LIBRA BANK LIMITED, Libra International Bank, S.A., Banco De La Provincia De Buenos Aires, Banco Espirito Santo E Comercial De Lisboa, Banco De Vizcaya, S.A., Banque Internationale A Luxembourg, S.A., Banque Rothschild, and the National Bank of Washington, Plaintiffs,**

v.

**BANCO NACIONAL DE COSTA RICA, S.A., Defendant.**

No. 81 Civ. 7624 (CBM).

United States District Court,
S.D. New York.

July 6, 1983.

Memorandum Opinion and Order
Aug. 12, 1983.

872

Sage, Gray, Todd & Sims by Jerry J. Strochlic, Stuart A. Krause, New York City, for plaintiffs.

White & Case by Jeffrey A. Barist, Diane Dimond, New York City, for defendant.

## AMENDED AND SUPPLEMENTAL OPINION

MOTLEY, Chief Judge.

Plaintiffs bring this action to recover their share of principal amounts, plus interest, of a $40 million loan made by sixteen banks, including seven of the plaintiffs herein, to defendant Banco Nacional de Costa Rica (Banco Nacional). Plaintiffs have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking an order requiring Banco Nacional to repay the principal amounts, plus interest, allegedly due under the promissory notes issued in connection with the loan. As its sole defense, Banco Nacional asserts that it is barred from repayment by an act of the Costa Rican government and that this court is barred from entering the requested order by the act of state doctrine. Also before the court is plaintiff's motion for an order compelling Banco Nacional to return and deposit $2.5 million with the Clerk of the Court as partial security for any judgment entered against Banco Nacional. Plaintiffs claim that this order is warranted because defendant allegedly ab-

sconded with such funds in an effort to avoid an order of attachment. For the reasons set forth below, plaintiffs' motion for summary judgment is granted but the motion to compel defendant to return its assets is denied.

*Background*

In or about December, 1980, Libra Bank Limited (Libra Bank), a banking corporation organized under the laws of the United Kingdom with a representative office in New York City, acted as an agent for sixteen banks[1] in the making of a $40 million loan to Banco Nacional, a banking concern wholly owned by the Costa Rican government, in order to provide pre-export and export financing of sugar and sugar products from Costa Rica. In connection with this loan, Banco Nacional entered into a loan agreement with plaintiffs. The agreement provided, *inter alia,* that the loan would be repaid in four successive installments to occur on July 30, August 30, September 30 and October 30, 1981.

After the loan agreement was executed, Banco Nacional drew down the full $40 million loan proceeds by requesting Libra Bank to credit Banco Nacional's account at a bank in New York City with such funds. Libra Bank subsequently honored that request pursuant to paragraph two of the loan agreement. On July 30, 1981, Banco Nacional paid Libra Bank the sum of $5 million plus interest in satisfaction of the first installment due under the loan agreement and the promissory notes executed thereon. Banco Nacional continued to pay interest until August 18, 1981. From that day forward, Banco Nacional has made no further payments.

1. Besides Libra Bank there are seven other plaintiff banks in this action. Libra International Bank, S.A. is a banking corporation organized under the laws of Panama with an office in Panama. Banco de la Provincia de Buenos Aires is a banking corporation organized under the laws of Argentina with an agency in New York. Banco Espirito Santo e Comercial de Lisboa is a banking corporation organized under the laws of Portugal with an office in London, England. Banco de Vizcaya, S.A. is a banking corporation organized under the laws of Spain with an office in London, England. Banque Internationale a Luxembourg, S.A. is a banking corporation organized under the laws of the Grand Duchy of Luxembourg with a representative office in New York. Banque Rothschild is a banking corporation organized under the laws of France with an office in Paris, France. The National Bank of Washington is a national banking corporation.

According to Banco Nacional, it was prevented from honoring the loan agreement by a resolution adopted by the Central Bank of Costa Rica on August 27, 1981, three days before the second payment was due.[2] The resolution was adopted in an effort to remedy Costa Rica's problems in servicing its external debts, *i.e.* debts to foreign creditors in foreign currency.[3] According to Banco Nacional, Costa Rica's banking laws require all foreign exchange transactions to be authorized by the Central Bank of Costa Rica. The August 27th resolution adopted by the Central Bank provided that only repayments of external debts to multilateral international agencies would be authorized.[4] Banco Nacional's requests for foreign currency in order to repay plaintiffs' loan was denied by the Central Bank.[5] On November 24, 1981, the President and the Minister of Finance issued a decree providing that the Republic and all public sector entities, including Banco Nacional, could not pay principal or interest on external debt in foreign currency without the prior approval of the Central Bank in consultation with the Minister of Finance.[6] The alleged effect of these decrees was to prevent Banco Nacional from repaying its loan to plaintiffs.

On September 14, 1981, plaintiffs obtained an order issued by the Supreme Court of the State of New York, County of New York, requiring defendant to show cause why an order of attachment should not be entered attaching the property of Banco Nacional in New York State. Defendant subsequently defaulted. On November 12, 1981, the application for an order of attachment was granted. Thereafter, the Sheriff of New York County levied upon the bank accounts of Banco Nacional in various banks in New York. Plaintiffs were able to attach approximately $800,000 held by defendant in various accounts.

On December 8, 1981, after levy had been made by the Sheriff, defendant removed the action to this court. Defendant also moved to dismiss for lack of *in personam* jurisdiction based on insufficiency of process [7] and to vacate the order of attachment. On December 11, 1981, plaintiffs moved to remand this case to the state court on the ground that this court lacked subject matter jurisdiction. The motion was denied. *See Libra Bank Limited, et al. v. Banco Nacional de Costa Rica, S.A.,* No. 81 Civ. 7624 (S.D.N.Y. Dec. 18, 1981). Before the scheduled date for argument on defendant's motion to vacate the attachment, defendant brought on by order to show cause a motion to expedite consideration of its motion. This court granted the motion to expedite and by opinion dated December 22, 1981, this court granted the motion on the ground that Banco Nacional had not waived its immunity to pre-judgment attachment. *Libra Bank Limited, et al. v. Banco Nacional de Costa Rica, S.A.,* No. 81 Civ. 7624 (S.D. N.Y. Dec. 22, 1981).

On April 12, 1982, the Second Circuit vacated this court's order noting, *inter alia,* that the authority relied on by the District Court, is "not controlling on this Court." *Libra Bank Limited, et al. v. Banco Nacional de Costa Rica, S.A.,* 676 F.2d 47, 50 (2d Cir.1982). Thereafter, plaintiffs attempted to have the United States Marshal levy on the same banks upon which the New York Sheriff had levied as well as a number of other banks. Plaintiffs discovered, however, that Banco Nacional no longer maintained accounts at any of those banks and

---

**2.** A copy of the resolution and a translation thereof is annexed as Exhibit A to the affidavit of Alvaro Santisteban Castro which was submitted in opposition to plaintiffs' motion for summary judgment.

**3.** *See* affidavit of Alvaro Santisteban Castro in Opposition to Motion for Judgment (Santisteban Affidavit) at ¶ 3.

**4.** Santisteban Affidavit at ¶ 4; Exhibit A attached thereto.

**5.** Santisteban Affidavit at ¶ 4.

**6.** Santisteban Affidavit at ¶ 4; Exhibit B attached thereto.

**7.** Banco Nacional subsequently withdrew the motion to dismiss when the insufficiency was cured.

had no other accounts in any New York banks.

Plaintiffs then brought the instant motions for summary judgment and for an order requiring defendant to return its assets.

## I.

A motion for summary judgment may be granted when 1) there are no disputed issues of material fact requiring trial and 2) the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *New York State Energy Research and Development Authority v. Nuclear Fuel Service,* 666 F.2d 787, 789 (2d Cir.1981).

Banco Nacional has submitted the affidavit of its Assistant General Manager, Alvaro Santisteban Castro, in opposition to plaintiffs' motion for summary judgment. An examination of Santisteban's affidavit and defendant's memoranda indicates that Banco Nacional's opposition to the motion is based on its view that the events occurring on August 27 and November 24, 1981, in Costa Rica constitute a defense to repayment under the act of state doctrine and that in any event material issues of fact exist with respect to these events. Plaintiffs claim that any factual disputes with respect to these events are immaterial. They claim that even if the court credits Banco Nacional's version of the facts that the Costa Rican decrees prevented it from obtaining foreign currency, the act of state doctrine is no defense to liability in this case because 1) the act of state doctrine applies only when the foreign state expropriates property within its own territorial boundaries—since the situs of the property in question is in the United States this court need not abstain from examining the acts' validity; and 2) even if the act of state doctrine does apply, this case falls within the commercial activity exception to that doctrine so that the court need not abstain from examining those acts.

### A. *The Act of State Doctrine*

The early cases charting the development of the act of state doctrine viewed that doctrine as being rooted in principles of sovereign immunity. *See Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *see generally* Note, Rehabilitation and Exoneration of the Act of State Doctrine, 12 N.Y.U.L.J. Int'l Law & Pol. 599, 600–610 (1977) (early history and development of the doctrine). Some forty years after the doctrine's first pronouncement by Chief Justice Fuller in *Underhill v. Hernandez,* the Cuban revolution and the legal disputes arising from those events led the Supreme Court to rethink the doctrine. *See Banco Nacional de Cuba v. Sabbatino,* 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd,* 307 F.2d 845 (2d Cir.1962), *rev'd,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *on remand sub nom. Banco Nacional de Cuba v. Farr,* 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd,* 383 F.2d 166 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968).

In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1968) (*Sabbatino*), the legal dispute was precipitated by the Cuban government's nationalization of the property within Cuba of an American commodity broker who had contracted to purchase sugar exports from Cuba. In *Sabbatino,* the Supreme Court renunciated its earlier pronouncement, set forth in *Underhill v. Hernandez,* that the act of state doctrine is rooted in principles of sovereign immunity. 376 U.S. at 421, 84 S.Ct. at 936. Instead, the Court held that although the doctrine is not required by the Constitution, it does have constitutional underpinnings because it is rooted in the "basic relationships [among] branches of government in a system of separation of powers." *Id.* at 423, 84 S.Ct. at 938. The doctrine "concerns the competency of dis-

similar institutions to make and implement particular kinds of decisions in the area of international relations," and embodies the "strong sense of the Judicial Branch that its engagement in the task of passing upon the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* Since the act of state doctrine obtains its status as a binding principle of legal decision ultimately from the constitutional principle of the separation of powers, "its continuing validity depends upon its capacity to reflect the proper distribution of functions with respect to matters implicating international relations among the three branches of government." *Id.* at 427–28, 84 S.Ct. at 939–40. Rather than laying down an inflexible or an all encompassing rule, the Supreme Court held that

the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Id.* at 428, 84 S.Ct. at 940. The Court then concluded that however offensive to the public policy of this nation the Cuban seizure may be, the dual goals of maintaining the judicial function in its appropriate sphere within our system of government and of establishing the rule of law among nations are best served by the foreclosure of judicial inquiry into the validity of the Cuban expropriations within its own territory. *Id.* at 437, 84 S.Ct. at 945.

B. *Application of the Act of State Doctrine to Extraterritorial Takings*

Under *Sabbatino*'s formulation, the act of state doctrine forecloses judicial inquiry into the validity of foreign seizures only when there is "*a taking of property within its own territory by a foreign sovereign government,*" *id.* at 428, 84 S.Ct. at 940

(emphasis added). This "territorial corollary," *see* Note, *supra,* 12 N.Y.U.L.J. Int'l Law & Pol. at 623–31, goes to the applicability of the act of state doctrine. Unless the expropriation occurs within the foreign state, this court is free to inquire into the validity of the acts of the foreign nation. This important limitation on the preclusive scope of the doctrine was recently stated by the Second Circuit:

Under the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property within its own territory ...; when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state "only if they are consistent with the policy and law of the United States."

*Banco Nacional de Cuba v. Chemical Bank of New York,* 658 F.2d 903, 908 (2d Cir. 1981) (Kearse, J.) (quoting *Republic of Iraq v. First National City Bank,* 353 F.2d 47, 51 (2d Cir.1965) (Friendly, J.), *cert. denied,* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966)). *See First National Bank, et al. v. Banco Nacional de Cuba,* 658 F.2d 895, 901 (2d Cir.1981); *Menendez v. Saks & Co.,* 485 F.2d 1355, 1364 (2d Cir.1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d 868, 873 (2d Cir.1976), *aff'g and modifying,* 392 F.Supp. 262 (S.D.N.Y.1975). *See also Stroganoff-Scherbatoff v. Weldon,* 420 F.Supp. 18, 20 (S.D.N.Y.1976); *F. Palicio y Compania, S.A. v. Brush,* 256 F.Supp. 481, 483–84 (S.D.N.Y.1966), *aff'd per curiam,* 375 F.2d 1011 (2d Cir.), *cert. denied, sub nom. Brush & Bloch v. Republic of China,* 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967).

In *Republic of Iraq v. First National City Bank,* 353 F.2d 47 (2d Cir.1965) (*Republic of Iraq*), the Republic of Iraq confiscated the assets of its deposed monarch, King Faisal II, held in deposit and custody accounts with a bank in New York City. Judge Friendly stated that in determining wheth-

er to question the validity of the confiscation decree, a court must first determine whether the property was located in the United States at the time of the attempted act of confiscation. 353 F.2d at 51. If the property is located in this country, a court must examine that act of seizure within the framework of our own policies and laws and must enforce it only if it is consistent with our system of jurisprudence. Because the Second Circuit concluded that King Faisal's assets were located in the United States, it refused to give effect to the foreign decree.

In the instant action, defendant argues that the acts of state in question occurred in Costa Rica.[8] Defendant also argues that the acts in question are the August 27, 1981 and the November 24, 1981 decrees passed by the Costa Rican government regulating the conduct of its banks with the effect that the loan cannot be repaid in New York. This case, according to defendant, is to be distinguished from *Republic of Iraq* where the decree stated that the foreign nation was seizing property located in New York. The court finds this argument to be without merit. First, the acts in question are not the resolutions passed by the Costa Rican government. As Judge Wisdom has stated, the act of state "refers to full exercise by the foreign state of dominion over the property in question, *not to the documentary execution of whatever legal action the foreign state takes toward the property or its own national* . . . . it looks not to the execution of a nationalization decree but rather to exercise of dominion over real property located in the United States." *Maltina Corporation v. Cawy Bottling Company,* 462 F.2d 1021, 1025 n. 3 (5th Cir.) (emphasis added), *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972). Second, defendant's argument that the Costa Rican decrees do not confiscate property but merely prevented defendant from repayment is also without merit. The property in question in this case is plaintiffs' legal right to repayment of the debt owed by the defendant. The Costa Rican decrees purport to alter the legal relations of the parties because they attempt to extinguish plaintiffs' rights. That act is as much an attempt to confiscate plaintiffs' property in this case as was the attempt to confiscate King Faisal's accounts in *Republic of Iraq.* That tangible property may have been involved in *Republic of Iraq* as opposed to intangible property here is a distinction without legal significance since in a strict legal sense all property is intangible. The American legal concept of property refers not to possession of "things," but to certain legal rights among persons with respect to "things." *See generally* B. Ackerman, *Private Property and the Constitution,* 26–27 (1977). Since the court finds defendant's attempts to distinguish this case from *Republic of Iraq* to be unavailing, the court turns now to an examination of cases illuminating Judge Friendly's two step analysis.

In *Menendez v. Saks,* 485 F.2d 1355 (2d Cir.1973) (*Menendez*), the Second Circuit stated that "[f]or purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." 485 F.2d at 1364. The court further stated that "the power to enforce payment of a debt, . . . the basis of our decision in *Republic of Iraq*[,] . . . generally depends on jurisdiction over the person of the debtor." *Id.* at 1365 (citing *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904)).

*Menendez* involved a dispute between former owners of a cigar manufacturing business and agents of the Cuban government or "interventors" who had been placed in charge of operating these businesses after their nationalization by the Cuban government. Both the former owners and the interventors asserted rights to pre-seizure debts owed by cigar importers in New York City. The court held that the doctrinal obstacle of the act of state did not bar judicial inquiry:

---

**8.** These arguments were made during oral argument. *See* Transcript of Hearing held on

September 15, 1982 (9/15/82 Tr.) at 25.

Application of the principles of [*Republic of Iraq*] satisfies us that since the owners' accounts receivable had their situs in the United States rather than in Cuba at the time of intervention and since the Cuban government's purported seizure of them without compensation is contrary to our own domestic policy, the act of state doctrine does not apply, the confiscation was ineffective, and the interventors' claim must be rejected.

The owners rather than the interventors therefore remain entitled to collect these accounts.

485 F.2d at 1364.

In *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d 868 (2d Cir.1976), Bangladesh and Pakistani plaintiffs asserted conflicting rights to payment for jute products exported from East Pakistan and resold in the United States prior to the March 26, 1971 "Proclamation of Independence" declaring East Pakistan to be the sovereign state of Bangladesh. The defendant, Cosmic International, Inc., a Delaware corporation with its principal place of business in New York, held two funds amounting to $97,043.50 and $433,365.96 which represented the proceeds from the sale of the jute

products in question. The defendant admitted that it owed the money but sought judicial clarification as to whom it should pay. In sum, the issue was whether the pre-revolution owners or the post-revolution successors owned the debt. The District Court, relying on *Republic of Iraq* and *Menendez,* held that the situs of the debt was in New York:

> [I]t is clear the sales transactions were complete and all that remained was the right to receive payment, which was to be made in New York City. This right existed before December 16, 1971, the date the new Bangladesh government gained control of East Pakistan. The act of state doctrine is inapplicable because the situs of the debts was New York at the time the Bangladesh government attempted to seize them.

*United Bank, Ltd. v. Cosmic International, Inc.,* 392 F.Supp. 262, 265 (S.D.N.Y.1975). The Second Circuit affirmed the District Court's analysis of the act of state doctrine, 542 F.2d at 872, and rejected each of the Bangladesh plaintiffs' arguments placing the situs of the debt in Bangladesh. *Id.* at 873–77.[9] *See also Vishipco Line v. Chase*

**9.** The Second Circuit did reject the Bangladesh plaintiffs' attempts to place the situs of the debt in Pakistan on the ground that the Bangladesh courts had jurisdiction over the debtor. The Court of Appeals first noted that the Bangladesh plaintiffs had not "called to our attention any cases which actually applied jurisdictional considerations in fixing situs at a place other than the debtor's domicile." 542 F.2d at 874.

While research has disclosed no cases in which jurisdictional factors were considered in fixing the situs of a debt at a place other than the domicile of the debtor in the context of the act of state doctrine, the court notes that courts have done so in other contexts. *See Barker v. Smith,* 290 F.Supp. 709, 711–12 (S.D.N.Y.1968) (Mansfield, J.) (situs of debt where corporate defendant was doing business); *Podolsky v. Devinney,* 281 F.Supp. 488, 493 (S.D.N.Y.1968) (same); *see also Great Falls Transfer & Storage Company v. Pan American Petroleum Corporation,* 353 F.2d 348, 349 (10th Cir.1965) ("for the purpose of garnishment a debt has no fixed situs and may be reached in any jurisdiction in which the person owing it may be found and subjected to process, provided the person to whom it is due could sue his debtor in that jurisdiction") (quoting *Morris W. Haft & Bros.*

*v. Wells,* 93 F.2d 991, 994 (10th Cir.1937)). While "*Shaffer* [*v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)] clearly overruled *Harris* [*v. Balk*] on its facts," *O'Connor v. Lee-Hy Paving Corp.,* 579 F.2d 194, 198 (2d Cir.1978) (citation omitted), *cert. denied,* 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978), "[t]he [Supreme] Court did not indicate total disapproval of *Harris v. Balk,* for it noted that attachment of a debt is proper wherever the debtor is found . . . ." *Intermeat, Inc. v. American Poultry, Inc.,* 575 F.2d 1017, 1022 (2d Cir. 1978). This court believes that *Harris* is still valid to the extent that when a debtor is sued in a court which has jurisdiction over the debtor, the debt has its situs in that jurisdiction assuming that personal jurisdiction over the debtor comports with the due process requirements of minimum contracts. *See Shaffer v. Heitner,* 433 U.S. 186, 207–11 [97 S.Ct. 2569, 2581–83, 53 L.Ed.2d 683] (1977); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

Second, the Court of Appeals noted that jurisdictional determinations would require American courts to interpret foreign law. This is clearly not an issue here.

Finally, in that case, the jurisdictional question was a purely speculative one since the Bangla-

*Manhattan Bank, N.A.,* 660 F.2d 854, 862 (2d Cir.1981) (*Vishipco Line*) (for purposes of act of state doctrine, "[t]he rule announced in *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905), continues to be valid on this point: the power to enforce payment of a debt depends on jurisdiction over the debtor), *cert. denied,* —— U.S. ——, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

The territorial limitation on the act of state doctrine was recognized recently by the New York Court of Appeals in *Weston Banking Corporation v. Turkiye Garanti Bankasi,* 57 N.Y.2d 315, 442 N.E.2d 1195, 456 N.Y.S.2d 684 (1982) (*Weston Banking*). In *Weston Banking,* the plaintiff, a Panamanian bank, sought to enforce a promissory note that was signed by the representatives of the defendant, a Turkish bank, on July 9, 1976, in Istanbul, Turkey. According to the terms of the note, defendant undertook an obligation to repay plaintiff principal in the amount of 500,000 Swiss francs, plus interest calculated at 9% per annum. The note provided that all payments were to be made at the offices of Chemical Bank (Chemical) in New York City. The note designated New York as the proper jurisdiction for the resolution of any disputes and, under the terms of the note, the defendant consented to the jurisdiction of the New York courts. 442 N.E.2d at 1196, 456 N.Y.S.2d at 685. The defendant bank duly borrowed the 500,000 Swiss francs. As the interest became due, defendant made payments in Swiss francs at Chemical's International Division in New York City. When the note was presented for repayment of the principal, defendant refused to pay on the grounds that the then existing Turkish banking regulations barred it from repaying the note in Swiss francs. Plaintiff moved for summary judgment. The trial court denied the motion. The Appellate Division modified, on the law, and granted plaintiff's motion for summary judgment. On appeal, the New York Court of Appeals affirmed. Noting that "the note requires payment to be made at Chemical Bank in New York City and designates

New York law to be controlling," 442 N.E.2d at 1199, 456 N.Y.S.2d at 688, the court stated:

> We conclude that on these facts the Act of State doctrine does not constitute a defense to plaintiff's action to recover on this note. A debt is not located within a foreign State unless it has the power at the instance of an interested party to enforce or collect it. . . . Here, the debt is equally capable of being enforced against the defendant's assets in New York as it is capable of being enforced against its assets in Turkey, and the state of Turkey has no power to enforce collection of this debt. The mere fact that this suit might have been commenced in Turkey, instead of New York, does not bar the · action. Indeed, the note provides that New York shall be the proper jurisdiction for dispute resolution. Such a provision naturally contemplates enforcement of any judgment which would resolve the dispute. Thus, the Act of State doctrine does not bar this action.

*Id.* (citations omitted). *See also Manas y Pineiro v. Chase Manhattan Bank, N.A.,* 106 Misc.2d 660, 434 N.Y.S.2d 868, 872 (Sup.Ct. 1980) (act of state doctrine applicable where both the res and the persons were inside foreign country at time of seizure).

### C. *Applying the Extraterritorial . Standards*

Unlike the majority of the act of state cases involving debts, this case does not involve the attempt by a foreign nation to confiscate a debt *owed* by a United States national *to* a foreign national, *see Republic of Iraq* (attempt to seize accounts owed by New York City bank to King Faisal); *Menendez* (Cuban interventors claiming New York debts owed to former owners of cigar manufacturing business); *United Bank, Ltd. v. Cosmic International, Inc.,* (attempt by newly spawned nation to seize New York debts owed to pre-revolution owners). Instead, this case involves the attempt by a foreign nation to avoid payment of a debt which *it* concededly owes *to* its creditors.

desh plaintiffs never sought to bring suit in Pakistan.

The posture of this case makes it somewhat difficult to apply the form of the test posed by the Second Circuit, that "a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." *Menendez,* 485 F.2d at 1364. That formula was composed in the factual context of attempts by a foreign state to seize for itself a debt owed to another. Applying it in this context, as did the court in *Weston Banking,* presents certain obvious difficulties. This is because the foreign state in almost all instances can in theory enforce a debt since the foreign national will in most instances be domiciled in the foreign nation; if a foreign corporation or bank is involved that entity will almost always have a branch in its home nation. The *Weston Banking* court hurdled this obstacle as follows:

> Here, the debt is equally capable of being enforced against the defendant's assets in New York as it is capable of being enforced against its assets in Turkey, and the State of Turkey has no power to enforce collection of this debt. The mere fact that this suit might have been commenced in Turkey, instead of New York, does not bar the action. Indeed, the note provides that New York shall be the proper jurisdiction for dispute resolution. Such a provision naturally contemplates enforcement of any judgment which would resolve the dispute.

442 N.E.2d at 1199, 456 N.Y.S.2d at 688. The *Weston Banking* court's underlying rationale, one that this court believes is sound, is that although a debtor may in theory be sued at the creditor's choice in either of two jurisdictions, the legal incidents of the debt may nevertheless place it, for the purposes of the act of state doctrine, in this nation rather than in the foreign nation.[10] This is so because when the creditor proceeds against the debtor in the place of his home,

he does so upon the theory that a creditor may always sue the person of the debtor in the place of his domicile upon the asserted jurisdictional basis that the courts there have personal jurisdiction over the debtor. The creditor may also sue the debtor wherever the debtor is found upon the different legal theory that the debt is located in that jurisdiction. The court notes this analysis is consistent with the historical formula set forth in *Harris v. Balk,* 198 U.S. 215, 222–23, 25 S.Ct. 625, 626–27, 49 L.Ed. 1023 (1905) ("The obligation of the debtor to pay his debt clings to and accompanies him wherever he goes. He is as much bound to pay his debt in a foreign state when therein sued upon his obligation by his creditor, as he was in the state where the debt was contracted.... This obligation can be enforced by the courts of the foreign state after personal service of process therein, just as well as by the courts of the domicile of the debtor."). Thus, this court believes that even if a creditor can sue a debtor in his home in a foreign state that has the power to compel the indigenous debtor to pay his debt, a United States court may still find that the situs of the debt was in this nation at the time of the attempted confiscation.

■ Turning to this case, this court concludes based on the following factors that the situs of the debt owed by Banco Nacional was in this nation at the time that the foreign currency decrees were enacted. Under the terms of the loan agreement, Banco Nacional consented to the jurisdiction of this court,[11] *see National Equipment Rental Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 414–15, 11 L.Ed.2d 354 (1965); and thus this court has jurisdiction over the debtor. *See Harris v. Balk,* 198 U.S. at 222–23, 25 S.Ct. at 626–27; *Vishipco Line,* 660 F.2d at 684. Banco Nacional also consented to have the letter agreement con-

---

10. The Court of Appeals did state that "the State of Turkey has no power to enforce collection of the debt." This court believes that the New York Court of Appeals made this statement because it believed it necessary to bend its case to conform to the extraterritorial formula. It seems rather apparent that the

government could compel its bank to pay the debt if it so desired.

11. Loan Agreement ¶ 21 annexed as Exhibit B. (Exh. B) to Plaintiffs' Affidavit in Support of the Motion for Summary Judgment (Plaintiffs' Affidavit).

strued in accordance with New York law.[12] Under the terms of the loan agreement, Banco Nacional was to make all payments to the Chase Manhattan Bank ("Chase") in New York City.[13] The promissory notes executed upon the loan agreement also provide that payment is to be made in Chase's New York branch. The notes further provide that Banco Nacional shall make all payments "free and clear of and exempt from ... any other charges and withholdings whatsoever imposed ... with respect to the ... performance ... of this Promissory Note."[14] The court further notes that at the time that the Costa Rican decrees were enacted, Banco Nacional had $2.5 million in various New York City bank accounts.[15] Of those assets, plaintiffs succeeded in attaching over $800,000 in connection with this lawsuit.[16] Moreover, Banco Nacional appears to have other considerable assets located in the United States including a majority ownership interest in Banco Internacional de Costa Rica which has a branch in Miami, Florida.[17]

Under these circumstances, this court holds that the situs of the debt was in New York at the time of the attempted confiscation by the Costa Rican government. The Costa Rican decrees attempted to alter the legal relations between the parties with respect to the debt by extinguishing the legal right to repayment, the only property in question, whose situs was in New York. The circumstances of this case are similar to those in *United Bank, Ltd. v. Cosmic International, Inc.,* 392 F.Supp. 262 (S.D.N.Y. 1975) where Judge Brieant ruled, "[A]ll that remained was the right to repayment, which was to be made in New York City. This right existed before December 16, 1971, the date the new Bangladesh government gained control of East Pakistan. The act of state doctrine is inapplicable because the situs of the debts was New York ...," *id.* at 265.

Since the act of state doctrine is inapplicable, this court may examine the validity of the Costa Rican decrees and need "give effect to [these] acts of state 'only if they are consistent with the policy and law of the United States.'" *Republic of Iraq,* 353 F.2d at 51 (citation omitted). The court holds that it shall not give effect to the Costa Rican decrees since a foreign state's effective confiscation of property, without compensation, is repugnant to the Constitution and laws of this nation. *See United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d at 873; *Menendez,* 485 F.2d at 1364; *Republic of Iraq,* 353 F.2d at 51.

The court is not unmindful that the effect of its judgment is to reverse the Costa Rican decrees. The court believes, however, that in this situation, because its judgment is unlikely to "'vex the peace of nations,' ... there is less need for judicial deference to the foreign affairs competence of the other branches of government." *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d at 875 (citation omitted) (quoting *Maltina Corp. v. Cawy Bottling Co. (Maltina Corp.),* 462 F.2d at 1028–29). As the Court noted in *Sabbatino:*

> It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.

376 U.S. at 428, 84 S.Ct. at 940. *Cf. Baker v. Carr,* 369 U.S. 186, 211–12, 82 S.Ct. 691, 706–08, 7 L.Ed.2d 663 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed ..., of its susceptibility to judicial handling in the light of its nature and posture in the

12. *Id.*

13. *Id.* at ¶ 7(b).

14. Exhibit C annexed to Plaintiffs' Affidavit.

15. 9/15/82 Tr. at 54.

16. Defendant removed those assets after this court vacated the attachment.

17. 9/15/82 Tr. at 49.

specific case, and of the possible consequences of judicial action.").

The Second Circuit has indicated that "the underlying rationale of the act of state doctrine should be considered when determining situs in a situation involving a purported extraterritorial seizure." *United Bank Ltd. v. Cosmic International, Inc.,* 542 F.2d at 874 (citing *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706; 714–15 (5th Cir.) (*Tabacalera*), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968)). In its discussion of the underlying rationale of the territorial limitation to the act of state doctrine, the *Tabacalera* court stated:

> The underlying thought expressed in all of the cases touching on the Act of State Doctrine is a common-sense one. It is that when a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res,* it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity. Furthermore, it is plain that the decisions took into consideration the realization that in most situations there was nothing the United States courts could do about it in any event.

392 F.2d at 715 (emphasis in original). The Second Circuit has stated that the *Tabacalera* court "recogniz[ed] that the act of state doctrine reflects at least in part the realization that in most cases there is nothing that an American court can do to rectify a foreign seizure which has been fully effected within the territory of the expropriating state...." *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d at 874 (citing *Tabacalera,* 392 F.2d at 715). On the other hand, "[w]here an act of state has not 'come to complete fruition within the dominion of ... [a foreign] government, '... no *fait accompli* has occurred ... [I]n the absence of such a *fait accompli,* there is less likelihood that any ensuing judicial review would jeopardize this country's foreign relations ...." *Id.* at 874 (quoting *Tabacalera,* 392

F.2d at 715–16). The Second Circuit then explicated the relationship between the territorial limitation and the legal source of the act of state doctrine:

> This emphasis on the completion of the Act of State squares with the policy considerations articulated in the *Sabbatino* decision.... The obvious inability of a foreign state to complete an expropriation of property beyond its borders reduces the foreign state's expectations of dominion over that property; "the concept of territorial sovereignty is ... deep seated ...." *Sabbatino, supra,* 376 U.S. at 431–32, 84 S.Ct. at 942. Consequently, [since] the potential for offense to the foreign state is reduced, there is less danger that judicial disposition of the property will "vex the peace of nations," ....

542 F.2d at 874–75 (quoting *Maltina Corp.,* 462 F.2d at 1028–29).

As *Sabbatino* indicates, the underlying rationale of the act of state doctrine is that the judicial branch may not pass upon the validity of foreign acts when to do so would vex the harmony of our international relations with that foreign nation. Rather, it is for the political branch, in the exercise of its considered judgment, to engage in acts which may have the possible consequence of significantly altering our relationship with a foreign nation. As the Second Circuit indicates, whether the act of the judicial branch will vex our relations with a foreign nation depends on the "foreign state's expectations of dominion over [the] property [in question]," *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d at 875 (quoting *Maltina Corp.,* 462 F.2d at 1028). Within its territorial boundaries, the foreign state has reasonable expectations of complete dominion over property and acts by courts of this nation declaring confiscation decrees invalid would "often be likely to give offense to the expropriating country; since the concept of territorial sovereignty is so deep seated, any state may resent the refusal of the courts of another sovereign to accord validity to acts within its territorial borders." *Sabbatino,* 376 U.S. at 432, 84 S.Ct. at 942. On the other hand,

a foreign state cannot be said to have reasonable expectations of dominion over property located in this nation because of "[t]he obvious inability of a foreign state to complete an expropriation of property beyond its borders . . . ." *United Bank, Ltd. v. Cosmic International, Inc.,* 542 F.2d at 875 (quoting *Maltina Corp.,* 462 F.2d at 1028). As these cases suggest, the territorial limitation to the act of state doctrine embodies the considered judgment of the judicial branch that a foreign state can be said to have reasonable expectations of dominion only with respect to property located within its own boundaries. In such circumstances, courts may not act because to do so would frustrate the foreign nation's reasonable expectations so as to vex our relationship with that foreign government.

These cases, discussed above, clarify the relationship between the territorial limitation and the ultimate source of the act of state doctrine's binding legal power, the constitutional principle of separation of powers. The territorial limitation is a judicially created device which serves to regulate the proper distribution of functions between the judicial and political branches. *Sabbatino,* 376 U.S. at 427–28, 84 S.Ct. at 939–40. The underlying notion embodied in the territorial limitation is the considered judgment of the judicial branch that courts will vex our relations with foreign governments only when they act to frustrate the foreign nation's reasonable expectations of dominion. On the other hand, a foreign nation cannot be said to entertain reasonable expectations of dominion over property located in this nation at the time of the attempted confiscation.

As the *Tabacalera* court stated, "[t]he situs of intangible property is about as intangible a concept as is known to the law." 392 F.2d at 714. This court is, of course, constrained to follow the teachings of *Republic of Iraq* and determine the situs of the debt at issue in this case. Having applied the tests set forth in *Harris v. Balk* and *Republic of Iraq* and their progeny, this court concluded that the situs of the debt at issue in the instant case was in this nation

and that the act of state doctrine is inapplicable to this case. Yet, the tests fashioned to determine the situs of a debt are rigid and mechanical and can be difficult to apply. More importantly, this inflexible approach, focusing on a somewhat formalistic analysis of the situs of the debt, may not be an accurate measure of the foreign state's reasonable expectations which appears to be the root notion underlying the regulatory purpose of the territorial limitation to the act of state doctrine. This court believes, therefore, that the inapplicability of the act of state doctrine is more clearly seen when the principle of objective reasonableness underlying the territorial limitation is applied directly to the facts of this case.

In this case, the act of state was incomplete at the time of the attempted confiscation. Since Banco Nacional was found here and had considerable assets here, "the Act of State itself remain[ed] incomplete in the absence of acquiescence by the forum state," *Maltina Corp.,* 462 F.2d at 1028, and in such a case as this, "[t]he obvious inability of a foreign state to complete an expropriation of property beyond its borders reduces the foreign state's expectations of dominion over that property," *id.* In this case, where a foreign government contracts to repay a debt in New York City, consents to the jurisdiction of our courts, waives its sovereign immunity with respect to legal proceedings concerning that debt, and continues to maintain considerable assets in this nation, it can hardly be said that this court's judgment shall frustrate the foreign state's reasonable expectations of dominion over the legal rights involved therein so as to vex our amicable relations with that foreign nation. Accordingly, the court concludes that its exercise of its judicial power is appropriate in this case and is fully consistent with the proper distribution of functions in our system of separation of powers between the "judicial and political branches of the Government on matters bearing upon foreign affairs." *Sabbatino,* 376 U.S. at 427–28, 84 S.Ct. at 939–40.

## II.

Plaintiffs also seek an order pursuant to the All Writs Act, 28 U.S.C. § 1651

(1976), compelling Banco Nacional to return $2.5 million to this jurisdiction as partial security for any judgment rendered against it by this court. The basis of this request is a claim that Banco Nacional engaged in allegedly improper conduct when it removed its assets from New York City.

Prior to the end of December, 1981, plaintiffs had attached approximately $880,000 in defendant's bank accounts in New York. This court subsequently vacated that order of attachment by opinion dated December 22, 1981. The rationale of that opinion was that based on the relevant authorities at that time, Banco Nacional had not waived its immunity to pre-judgment attachment. On April 12, 1982, the Second Circuit held that Banco Nacional had waived its immunity and vacated this court's order. When plaintiffs sought to re-attach defendant's assets in New York, plaintiffs found that defendants had transferred all of its assets out of New York. Plaintiffs then brought this motion before the court.

Plaintiffs claim that this relief is appropriate because Banco Nacional engaged in certain misrepresentations concerning its ability to transfer its assets out of its New York City banks. The gravamen of this alleged fraud is Banco Nacional's assurance that it could not transfer any of its funds out of New York City. The court notes that even if such misrepresentations were made, that alleged deception had nothing to do with this court's vacatur of the attachment order. This court's opinion was based upon its interpretation of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq., and the relevant authorities at that time. Such an order requiring defendant to return its assets shall not be forthcoming absent a showing that Banco Nacional deceived this court into vacating the attachment, so that the requested relief will serve to protect the jurisdiction of this court and to vindicate the integrity of the judicial process. Moreover, the court notes that plaintiffs could have sought a stay of this court's vacatur order pending appeal or a restraining order preventing Banco Nacional from transferring its assets out of New York. Under these circumstances, the court will not now issue an extraordinary writ to effect what plaintiffs could have done through ordinary means.

### III.

After a perusal of the affidavits and supporting memoranda submitted by both parties with respect to the summary judgment motion, the court concludes that the sole material dispute in this case involves a legal issue only. Banco Nacional admits that the principal amounts, plus interest, allegedly due under the promissory notes are in fact due. Banco Nacional contends that it would make such payments but for the fact that it is prohibited from doing so by acts of the Costa Rican government, i.e. the foreign exchange decrees. From these facts, defendant admits that a judgment could be entered in plaintiffs' favor but for this court's abstention which it claims is required by the act of state doctrine. Plaintiffs, on the other hand, contend that even if this court credits defendant's version of the facts, the act of state doctrine is inapplicable to an attempted extraterritorial confiscation. The applicability of the act of state doctrine is the only material dispute in this case. This court has resolved that legal dispute in plaintiffs' favor. Since the court has decided that the act of state doctrine is not applicable, it need not reach the issue of whether this case falls within the commercial activity exception to the doctrine, if such an exception exists. See, e.g., Alfred Dunhill of London, Inc. v. Republic of China, 425 U.S. 682, 695–702, 96 S.Ct. 1854, 1861–1865, 48 L.Ed.2d 301 (1976) (plurality opinion of Justice White); First National Bank, etc. v. Banco Nacional de Cuba, 658 F.2d 895, 902 (2d Cir.1981) ("If there were a 'commercial activity doctrine,' ... we would not view it as applicable here"); cf. International Association of Machinists, etc. v. OPEC, 649 F.2d 1354, 1360 (9th Cir.1981) ("The act of state doctrine is not limited by the commercial activity exception...."), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). See also Friedman and Blau, Formulating a Commercial Activity Exception to the Act of State Doctrine:

*Alfred Dunhill of London, Inc. v. Republic of Cuba,* 50 St. John's L.Rev. 667 (1976) (urging the adoption of the commercial activity exception to the act of state doctrine).

IV.

Having decided that the loan agreement of December 23, 1980 can be enforced, the court turns now to the remaining issues of contract interpretation and construction. The parties disagree as to the applicable interest rates for (i) past due interest and for (ii) penalty or default interest. The parties also disagree as to whether plaintiffs are entitled under the loan agreement to recover their attorneys' fees, disbursements, and expenses incurred in connection with the enforcement of the loan agreement. Moreover, assuming that plaintiffs are entitled to their attorneys' fees, disbursements, and expenses, defendant disputes the amount recoverable.

██ At the outset, the court notes that its task of interpretation, as distinguished from its task of construction, "is the process of endeavoring to ascertain the meaning or meanings of symbolic expressions used by the parties to a contract ...." Patterson, *The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 833 (1964); *see also Restatement (Second) of Contracts* § 200 (1981); 4 S. Williston, A Treatise on the Law of Contracts (Williston on Contracts) § 600A at 286 (3d ed. 1961); 3 A. Corbin, Corbin on Contracts (Corbin on Contracts) § 534 at 9 (1960). By the construction of a contract, the court determines "its legal operation—its effect upon the action of courts and administrative officials." 3 Corbin on Contracts § 534 at 9 (footnote omitted). Given this distinction, then "the construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a determination of the legal relations of the parties." *Id.* (footnote omitted). When the interpretation of a contract discerns a clear meaning, all that is left to the task of construction is to give operative effect to the legal relations described. Sometimes due to a defect in the contract language, the process of interpretation falls short of discerning a meaning which can be given legally operative effect. At that point, when the court must fill in the gaps of an agreement and arrive at a set of legal relations not described by the language of the contract only, the court has engaged in the process of the construction not the interpretation of meaning. *See* 3 Corbin on Contracts § 534 at 11–12. If the court may by an examination of the contract language alone discern a plain and distinct meaning, then the court should not resort to other methods of discerning meaning but should enforce the legal relations as described by the meaning attributed to the contract. *See Western Union Tel. Co. v. American Communications Association,* 299 N.Y. 177, 184, 86 N.E.2d 162, 166 (1949); *Noel J. Brunell & Son, Inc. v. Town of Champlain,* 95 Misc.2d 320, 407 N.Y.S.2d 376, 379 (Sup. Ct.1976), *aff'd,* 64 A.D.2d 757, 407 N.Y.S.2d 447 (3rd Dep't 1978); *Todem Homes, Inc. v. Freidus,* 84 Misc.2d 1023, 374 N.Y.S.2d 923, 929 (Sup.Ct.1974), *mod. on other grounds,* 55 A.D.2d 640, 390 N.Y.S.2d 9 (2d Dep't 1976). *See also* 22 N.Y.Jur.2d § 188 (1982); 3 Corbin on Contracts § 535 at 19–20.

A. *The Applicable Rates of Interest*

In order to provide a background for the disputes with respect to the applicable interest rates, the court believes that it would prove useful to set forth the schedules of repayment as well as other relevant definitions as provided by the contract:

1. *Definitions*

\* \* \* \* \* \*

"Interest Payment Date" means:

(i) with respect to the First Interest Payment Date, 30 January 1981;

(ii) with respect to the second and third Interest Payment Dates, 30 April 1981 and 30 July 1981 respectively; and

(iii) with respect to the Interest Payment Dates thereafter, the relevant Repayment Dates.

"Interest Period" means successive periods for the calculation of interest. The first Interest Period shall commence on the Drawdown Date and end on the First Interest Payment Date, and the next Interest Period for each Repayment [Installment] shall commence immediately on the expiry of the First Interest Period and end on the relevant Repayment Dates.

\* \* \* \* \* \*

### 4. Repayment

The Loan will be repaid in four successive [installments] ("Repayment [Installments]") which will be payable respectively in the amounts and on the dates ("Repayment Dates") set forth below:

| Repayment Date | Amount of [Installment] |
| --- | --- |
| 30 July 1981 | US$ 5,000,000 |
| 30 August 1981 | US$10,000,000 |
| 30 September 1981 | US$10,000,000 |
| 30 October 1981 | US$15,000,000 |

Under this loan agreement, interest is paid at the end of each Interest Period. The first Interest Period began on the Drawdown Date of the loan and ended on the First Interest Payment Date, January 30, 1981. The second Interest Period began on the next day, January 31, 1981, and ended on April 30, 1981. The third Interest Period commenced on May 1, 1981, and ended on July 30, 1981, the last Interest Payment Date. The fourth Interest Period commenced on July 31, 1981, and ended on the next Repayment Date, August 30, 1981. The loan agreement also provides for the calculation of interest as follows:

### 6. Interest

(a) The Borrower will pay interest on the Loan calculated in respect of each Interest Period at whichever rate the Agent in its sole discretion shall determine to be the higher of:

(i) three quarters per cent per annum above the rate at which the Agent offers leading banks in the London Interbank Market dollar deposits comparable in amount and Interest Period to the relevant portion of the Loan at 11:00 a.m. (London time) two days prior to the first day of each such period (LIBOR); or

(ii) the rate per annum equal to three-quarters per cent over the prime commercial rate (PRIME) of [t]he Chase Manhattan Bank (National Association) at its principal office in New York City prevailing three days prior to the first day of the relevant Interest Period.

Since the parties agree that Chase's prime commercial rate was higher at all relevant times than the London Interbank Offer Rate, the court shall refer only to Chase's Prime Rate in the examples that follow. Under the formula, the interest rate for past due interest is calculated by first determining Chase's Prime Rate three days prior to the first day of the relevant Interest Period and then adding ¾% to the Prime Rate. Thus, the interest rate for the second Interest Period of January 31, 1981 to April 30, 1981 is calculated by adding ¾% to Chase's prime rate prevailing on January 28, 1981. For the third Interest Period of May 1, 1981 to July 30, 1981, the interest rate for past due interest is Chase's Prime Rate on April 28, 1981 plus ¾%. The same calculation is made for each ensuing period.[18]

In the instant case, Banco Nacional complied with the loan agreement as follows: It paid the $5 million installment of princi-

---

**18.** Apparently, Banco Nacional paid past due interest for the second and third Interest Periods at the rate of ¾% above Chase's Prime Rate on January 27, 1981. See Affidavit of Cynthia Miskin in Support of Plaintiff's Proposed Judgment at ¶ 4. According to the terms of the loan agreement, the applicable rate for the second Interest Period (1/31/81 through 4/30/81), should have been ¾% above Chase's Prime Rate on January 28, 1981. Similarly, the applicable rate for the third Interest Period (5/1/81 through 7/30/81) should have been ¾% above Chase's Prime Rate on April 28, 1981. The parties may, of course, consent to different arrangements than those explicitly provided for in the contract. This court, however, must interpret the contract according to its terms unless a showing is made that the contract was later modified. Here, neither party has argued that the contract should be interpreted except according to its terms.

pal due on July 30, 1981.[19] Banco Nacional paid past due interest on the entire loan up to July 30, 1981.[20] Banco Nacional also paid past due interest for the fourth Interest Period (7/31/81 through 8/30/81) on the $10 million installment of principal due on August 30, 1981. In all other respects, Banco Nacional breached its agreement with Libra Bank.

Past due interest is due on the remainder of the principal, $25 million, for the fourth Interest Period (7/31/81 through 8/30/81). That interest is to be calculated at ¾% above Chase's Prime Rate on July 28, 1981. This rate is to be applied to the Interest Period, *i.e.* a period of thirty-one (31) days.[21]

The court turns now to the question of default interest. According to the loan agreement, Banco Nacional was to pay a $10 million installment due on August 30, 1981. On August 31, 1981, Banco Nacional was in default of its $10 million installment after it had failed to make payment on August 30. The loan agreement sets forth the following provision governing default:

15. *Default*

If the Borrower makes any default in any of the terms hereof, or is in default

under the terms of any agreement for borrowed money, the Agent, after consultation with the Banks, shall be entitled to declare the entire amount of the Loan together with accrued interest, costs and expenses immediately due and payable without notice, the right to which is hereby formally waived.

On September 11, 1981, Libra Bank accelerated the remainder of the loan according to the terms of the contract.[22] Thus, from August 31, 1981, to the present, Banco Nacional has been in default of the $10 million installment payment due on August 30, 1981. From September 11, 1981, to the present, Banco Nacional has been in default of the entire remaining portion of the loan, $25 million, due on September 11, 1981.[23]

The loan provides that the rate of default interest is to be calculated as follows:

7. *Payments*

\* \* \* \* \* \*

(b) If default is made on the due date for payment of any amount hereunder, the Borrower will pay the rate of interest calculated as described in paragraph 6(a) for the period of default to

---

**19.** Letter Agreement ¶ 4.

**20.** Affidavit of Cynthia Miskin in Support of Plaintiffs' Proposed Judgment (Miskin Affidavit) at ¶ 4.

**21.** *But see* note 23 *infra.* By calculating the fourth Interest Period as beginning on July 30, 1981, plaintiffs mistakenly characterize the fourth Interest Period as thirty-two (32) days long. Actually, July 30, 1981 is the last day of the *third* Interest Period and July 31, 1981 is the first day of the fourth period.

**22.** *See* 9/11/81 telex from Libra Bank to Banco Nacional annexed as Exhibit C to Affidavit of Conrad dè Velasco in Support of Plaintiffs' Motion for Summary Judgment.

**23.** Since the court concludes that the remaining $25 million was not in default until September 11, 1981, Banco Nacional owes additional past due interest on the $25 million from August 31, 1981 to September 10, 1981. Thus, the total period for past due interest on the $25 million is a period of forty-two (42) days to be figured at Chase's Prime Rate of July 28, 1981. The Miskin affidavit appears to assume that the entire remainder of the loan has been in default since August 31, 1981. This was also

the contention of Libra Bank's counsel during the oral argument held on these matters on April 20, 1983. However, the loan agreement provides that the remaining payments of the remaining installments were not due until September 30 and October 30, 1981. The acceleration clause in this loan arrangement did not provide for automatic acceleration of the remaining installments upon default of any single installment. If there had been such an automatic acceleration clause, then the entire loan would have been in default on August 31, 1981. Alternatively, if Libra Bank had accelerated the remainder of the loan on August 31, 1981, that would have put the entire remainder of the loan in default triggering the default interest rate. However, acceleration was not declared until September 11, 1981. Thus, Banco Nacional was not in default of these payments until September 11, 1981 when it failed to pay those amounts declared due on September 11, 1981. *Cf. State of New York v. Monastero*, 62 A.D.2d 792, 406 N.Y.S.2d 382, 383 (3rd Dep't 1978) (loan note provided that in the event of any default of any installment of principal, then the whole of the principal sum then remaining becomes automatically due and payable at once).

the date of actual payment plus three-quarters per cent per annum.

■ The parties dispute the proper operation of the default provision. Plaintiffs argue that Chase's Prime Rate prevailing three days before the beginning of the default period should be applied for the entire period of default which is some 22 months long.[24] Banco Nacional contests this interpretation of the contract. Defendant notes that pursuant to ¶ 7(b) the default rate is determined by adding ¾% to the past due interest rate calculated according to the instructions provided in ¶ 6(a)(i) and (ii). According to Banco Nacional, ¶ 6(a)(i) clearly contemplates interest rates fixed upon short term periods since it refers to the choice between the higher of the London Interbank Offer Rate (LIBOR), an interest rate fixed with reference to short term loans,[25] and Chase's Prime Rate. Banco Nacional further argues that there simply does not exist a 22 month LIBOR and to read the loan agreement as fixing a single rate, based upon a choice between a non-existent LIBOR and the Prime Rate, for the entire default period renders this provision meaningless.[26] Instead, Banco Nacional urges the court to compute the interest rate on a monthly basis, choosing between the higher of LIBOR and the Prime Rate at the beginning of each month during the entire default period. Plaintiffs, on the other hand, argue that the loan agreement fixes a uniform rate for the entire default period, that since Chase's Prime Rate was higher than the LIBOR at the beginning of the default period, the Chase Prime Rate prevailing on August 27, 1981, as adjusted according to the loan agreement for a figure of 22%, should be applied for the entire period.[27]

**24.** It should be noted that interest rates were at a historic high during the Summer and early Fall months of 1981. For instance, on September 21, 1981, the Prime Rate was 19½%. *See* Exhibit B Annexed to Defendant's Memorandum in Support of Proposed Judgment. On February 28, 1983, the Prime Rate had fallen to 10½%. This fact cannot, of course, be taken into account in this court's interpretation of the contract, since the court may not, under the guise of interpretation, rewrite a contract in order to relieve one of the parties from disadvantageous terms. *De Vanzo v. Newark Insurance Company,* 44 A.D.2d 39, 353 N.Y.S.2d 29, 33 (2d Dep't 1974), *aff'd* 37 N.Y.2d 733, 337 N.E.2d 131, 374 N.Y.S.2d 619 (1975); *Seifert, Hirshorn & Packman, Inc. v. Insurance Company of North America,* 36 A.D.2d 506, 321 N.Y. S.2d 815, 817 (1st Dep't 1971); *see also International Union of Electrical and Machine Workers, AFL–CIO v. General Electric Company,* 337 F.Supp. 817, 821 (S.D.N.Y.1972); Williston on Contracts § 610A (3d ed. 1961).

**25.** "LIBOR" is an acronym for the standard London interbank offer rate of interest paid by name banks of the highest credit standing. R. McKinnon, *Money in International Exchange* 207 (1979); *see also* E. Altman, *Financial Handbook,* § 13–12, –13 (5th ed. 1981); *see generally* H. Riehl & R. Rodriguez, *Foreign Exchange Markets* (1977).

**26.** At oral argument on these matters, defendant argued as follows:

Under the plaintiff's interpretation of this agreement, that becomes meaningless because LIBOR is based on a short term period. There are 30-day LIBOR rates, 60-day LIBOR rates and 90-day LIBOR rates. There is no such thing as a 590-day LIBOR rate, which is what you would have to come up with in order to make some kind of a choice between prime and LIBOR for this default period that they claim is this default interest rate.

The loan agreement clearly does not provide for something that couldn't happen. There is no such thing as a 590-day LIBOR rate.

The only meaningful, logical interpretation of this provision is that the interest during a default period must be computed monthly, making a choice between the higher of Chase's prime rate or LIBOR and adding the 3/4 percent and then the additional 3/4 penalty.

Transcript of hearing held on April 20, 1983 (4/20/83 Tr.) at 24–25.

**27.** As the court has already noted, plaintiffs have incorrectly calculated the default period. The difference between the plaintiffs' and the defendant's version of the judgment (including the disputes as to interest, attorneys' fees and costs) is not inconsiderable. As of April 13, 1983, the originally scheduled date for the hearing on the judgment, the difference was as follows:

| | Plaintiffs' version | Defendant's version |
| --- | --- | --- |
| Libra Bank Int'l, S.A. | 5,566,141.91 | 5,041,568.07 |
| Banco de la Provincia de Buenos Aires | 2,473,842.48 | 2,240,696.90 |
| Banco Espirito Santo e Comercial de Lisboa, S.A. | 2,473,842.48 | 2,240,696.90 |

Defendant's argument that the loan agreement is poorly drafted is not without some force. Plaintiffs do not answer defendant's contention that a 22 month LIBOR does not exist. Indeed, as defendant argues, LIBOR is based on short term periods:

> The essence of eurocurrency floating rate loans is the manner in which the loans are funded by the lender. In order to make a loan a bank borrows matching funds from other banks in the market for on-lending. These funding deposits are taken for short terms such as *3, 6 or 12 months (interest periods)* and at the end of each interest period the bank pays back the underlying deposit and immediately reborrows another deposit for a further period. The interest rate payable by the ultimate borrower will be a specified percentage, known as the "spread" or "margin" (which represents the gross profit and remuneration for the risk), above the rate at which the bank borrows the underlying deposits from other banks in the London interbank market. That rate is known as the London interbank offered rate ("LIBOR"). Hence the interest rate floats and is calculated by reference to the cost of funds to the bank in the market at the beginning of each interest period. That cost would depend upon the credit of the lending bank. In syndicated credits the LIBORs of selected reference banks are averaged out for the purposes of interest determination.
>
> In practice many banks fund loans out of their own pool of funds without going to the market.

P. Wood, Law and Practice of International Finance 10.8(2) at 253 (1980) (emphasis add-ed); *see also* R. McKinnon, *Money in International Exchange* 207 (1979); E. Altman, *Financial Handbook,* § 13–12, –13 (5th ed. 1981); Wall St.J., June 20, 1983 at 22, Col. 3 (providing LIBORs for three-month ($9^{11}/_{16}$%), six-month ($9^{15}/_{16}$%) and one-year ($10^{3}/_{16}$%) periods). It seems apparent that plaintiffs never contemplated, insofar as their intent is expressed in the language of the loan agreement, a default period lasting beyond any possible LIBOR interest period. On the other hand, this defect in the plaintiffs' contractual language does not mean that this court must adopt defendant's version of the construction of intent.

In order to determine more precisely the nature of the defect in plaintiffs' contract language and to discern the intention of the parties so that the court may enforce the contract consistent with the intent of the parties, it will prove useful to see precisely how the language of ¶ 6(a)(i) functions and where it fails. Suppose that plaintiffs had received a judgment, marking the end of the default period, on August 31, *1982,* or exactly one year from the date of default. At this point, since there is a one-year LIBOR interest period, *see* Wall St.J., June 23, 1983, at 23, col. 3 ($10^{3}/_{16}$% for one-year period), plaintiffs would have a choice between two legally operable provisions of the contract, *i.e.* a choice between the higher of the Prime Rate or LIBOR. One day after that, on September 1, 1982, plaintiffs would no longer have such a choice since the LIBOR provision, ¶ 6(a)(i), provides for an alternative which cannot be given legally operative effect. The defect in the contract language is its failure to anticipate a default beyond one year. The contract was drafted so that ¶ 6(a)(i) would have a legally operative life

| | Plaintiffs' version | Defendant's version |
|---|---|---|
| Banco de Vizcaya, S.A. | 2,473,842.48 | 2,240,696.90 |
| Banque Internationale a Luxembourg, S.A. | 2,473,842.48 | 2,240,696.90 |
| L'Europeene de Banque | 2,473,842.48 | 2,240,696.90 |
| National Bank of Washington | + 1,470,794.76 | + 1,302,843.26 |
| | $19,406,149.07 | $17,547,895.83 |

The difference between the plaintiffs' version and defendant's version is as follows:

$$19,406,149.07 - 17,547,895.83 = \underline{\$1,859,253.24}$$

Since the legal fees and costs in dispute amount to $649,881.79, the difference between the parties with respect to the calculation of past due and default interest only is $1,209,371.45.

of one year; thus, had Libra Bank obtained a judgment at any point up to August 31, 1982, defendant simply could not advance the argument that ¶ 6(a)(i) and (ii) is meaningless unless the court uses a month-by-month calculation.

The intent of the parties as expressed by ¶ 6(a)(i) and (ii) is that a fixed rate should apply for the entire default period. *See* ¶ 7(b) ("If default is made . . . , the Borrower will pay the rate of interest . . . for the period of default to date of actual payment"). The contractual defect, of course, is that beyond a certain point, a fixed LIBOR no longer exists. Given the intent of the parties insofar as it was expressed by the defective language of the contract, it becomes clear that defendant's proposal that the court apply a month-by-month calculation is manifestly contrary to that intent.

As the court has already noted, the language of ¶ 6(a)(i) limits the operative life of this provision to a one-year period after which point the provision becomes void. The defect in the language of the contract does not, however, render ¶ 6(a) in its entirety meaningless. ¶ 6(a) is written in the disjunctive and provides a choice between the *higher* of the rates as specified by ¶ 6(a)(i) (LIBOR) or ¶ 6(a)(ii) (Chase's Prime Rate). Although ¶ 6(a)(i) became void one year after the initial default, ¶ 6(a)(ii) remains operative. The effect of the oversight in the drafting of ¶ 6(a)(i) is that one of the two alternatives becomes unavailable after one year and not that the entire provision becomes meaningless. In order to render a disjunctive provision meaningless, *both* alternatives must be meaningless not only one. Simply because a portion of a disjunctive provision becomes void does not mean that the court should then ignore the remaining operative provision of the contract, especially when that remaining provision implements the intent of the parties to provide a fixed rate of interest for the entire default period.

The court concludes that although the loan agreement could have been more clearly drafted, the intent of the parties was to have a fixed interest rate apply to the entire default period. In addition, although one of the provisions of ¶ 6(a) ceased to be legally operative after one year, the alternative provision, specifying the use of Chase's Prime Rate, continues to be operative and is to be given legal effect. Accordingly, with respect to the $10 million installment, default interest is to be calculated according to ¶¶ 7(b) and 6(a)(ii) by the use of Chase's Prime Rate prevailing on August 28, 1981. With respect to the remaining $25 million, default interest is to be calculated under the loan agreement by the use of Chase's Prime Rate prevailing on September 8, 1981, for the entire default period which commenced on September 11, 1981. Past due interest is due on the $25 million for the fourth Interest Period (7/31/81 to 8/30/81) and the period from August 31, 1981 to September 10, 1981, for a total of forty-two (42) days to be calculated by the use of Chase's Prime Rate prevailing on July 28, 1981.

## B. *Attorneys' Fees and Costs*

The remaining dispute in this case concerns attorneys' fees and costs. Plaintiffs seek to recover their counsel fees and expenses based upon the following provision contained in each of the promissory notes pledged by Banco Nacional to each of the plaintiff banks:

> The Borrower hereby undertakes to pay all expenses legal or otherwise incurred by the Bank in the enforcement of the terms hereof.

Preliminarily, Banco Nacional argues that this provision does not entitle plaintiffs to recover attorneys' fees and costs at all. Secondly, Banco Nacional asserts that even if plaintiffs are entitled to their claimed fees and costs, the amounts sought are unreasonable and must be reduced.

The costs and fees provision in the notes is to be construed according to New York law, both because that was the state in which the notes were made, delivered, and honored in part, *see, e.g., Security Mortgage Co. v. Powers,* 278 U.S. 149, 153–54, 49 S.Ct. 84, 85–86, 73 L.Ed. 236 (1928); *In Re United Merchants and Manufactur-*

ers, Inc., 674 F.2d 134, 137 (2d Cir.1982); Jackson v. Oppenheim, 533 F.2d 826, 831 (2d Cir.1976), and because the loan agreement contains a choice of law provision naming New York law as governing. See Corporacion Venezolana de Fomento v. Vintero Sales, 629 F.2d 786, 793 (2d Cir.1980) (where loan agreement contained clause choosing New York law as governing, that choice of law was valid and binding upon loan agreement), cert. denied, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981).[28]

■ Under New York law, a covenant in a note providing that the obligator shall pay attorneys' fees and costs expended in the collection or enforcement of a note is enforceable. See Jackson v. Oppenheim, 533 F.2d at 831; see also Swiss Credit Bank v. International Bank, Ltd., 23 Misc.2d 572, 200 N.Y.S.2d 828, 830 (Sup.Ct.1960) (counsel fees are recoverable if specific language shows such an agreement); First National Bank & Trust Co. of Elmira v. Conzo, 169 Misc. 268, 7 N.Y.S.2d 334, 336 (Sup.Ct.1938) (provision in contract providing for attorneys' fees valid). Where such provisions are valid under state law, they are enforceable in federal court. See United States v. Carter, 217 U.S. 286, 322, 30 S.Ct. 515, 526, 54 L.Ed. 769 (1910); Alland v. Consumers Credit Corporation, 476 F.2d 951, 956 (2d Cir.1973).

New York law insists that "[i]n the absence of an explicit contractual or statutory provision for the allowance thereof, attorneys' fees incurred in litigation are not compensable." Richcar Music Co. v. Towns, 67 A.D.2d 888, 413 N.Y.S.2d 705, 707 (1st Dep't 1979); See Flaks, Zaslow & Co. v. Bank Computer Network, 66 A.D.2d 363, 413 N.Y.S.2d 1, 3 (1st Dep't 1979); Klein v. Sharp, 41 A.D.2d 926, 343 N.Y.S.2d 1014, 1015 (1st Dep't 1973); Piaget Watch Corporation v. Audemars Piquet & Co., 35 A.D.2d 920, 316 N.Y.S.2d 104, 105 (1st Dep't 1970) (attorneys' fees are normally a nonrecoverable item); Royal Discount Corp. v. Luxor Motor Sales Corp., 9 Misc.2d 307, 170 N.Y. S.2d 382, 383 (1st Dep't 1957).

■ Defendants contend that the words "all expenses legal or otherwise" are not sufficiently explicit to warrant an award of attorneys' fees under New York law. In determining what constitutes language sufficient to indicate attorneys' fees, the New York courts have held that the word "costs" does not include attorneys' fees. See In Re O'Brien's Trust, 28 A.D.2d 1040, 283 N.Y. S.2d 926, 928 (3rd Dep't 1967) (suggestion that "costs" includes "counsel fees" is unfounded); Pelella v. Pelella, 13 Misc.2d 260, 176 N.Y.S.2d 862, 867 (Sup.Ct.1958) ("Costs, unknown at common law, are awarded by statute and attorneys' fees are not considered as costs"), aff'd, 9 A.D.2d 897, 195 N.Y.S.2d 599 (2d Dep't 1959); Caperna v. Williams-Bauer Corporation, 185 Misc. 687, 57 N.Y.S.2d 254, 255 (Cty.Ct.1945) (same), aff'd, 186 Misc. 27, 58 N.Y.S.2d 876 (1st Dep't 1945). Cases have also held that "[t]he terms 'costs' and 'expenses' ... do not include attorney's fees." Royal Discount Corp., 9 Misc.2d at 308, 170 N.Y.S.2d at 383 (emphasis added); Hayman v. Morris, 37 N.Y.S.2d 884, 891 (Sup.Ct.1942).

However, as the Second Circuit stated in connection with its interpretation of the terms "cost of suit":

> We find these cases to be of little help, however, for we deal in this appeal not with the more commonly used term "costs", which does indeed carry the technical meaning urged by appellee (i.e., mere court fees), nor with a statute by which a legislative body has provided for the awarding of "costs" to a successful litigant: .... Rather, we have here a contract in which the words "costs of suit" were intended to carry a meaning as understood by both parties to the agreement.

Alland v. Consumer Credit Corporation, 476 F.2d at 955 (citation and footnote omitted; emphasis in original). The court then held that because the payee of the note in that

---

**28.** At any rate, the parties do not dispute the applicability of New York State law to the contract.

case was a layman and that a reasonable layman would believe the terms "costs of suit" to include attorneys' fees, those terms would be so interpreted and enforced. 476 F.2d at 958.

■■■ Defendant argues that the terms in question are ambiguous, and as such, they should be construed against Libra Bank, the drafter of the contract. *See Restatement (Second) of Contracts* § 206 (1981); *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197, 1207 (2d Cir.1970). On the other hand, contractual ambiguity is not established simply because the parties disagree as to the meaning of a particular provision, *see Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 695 (10th Cir. 1981); *Boudreau v. Borg-Warner Acceptance Corp.*, 616 F.2d 1077, 1079 (9th Cir. 1980), and where there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation in order to relieve a party from an improvident bargain. *Collard v. Incorporated Village of Flower Hill*, 52 N.Y.2d 594, 421 N.E.2d 818, 439 N.Y.S.2d 326, 331 (1981); *Aloi v. Board of Education of West Babylon, etc.*, 81 A.D.2d 874, 439 N.Y.S.2d 169, 172 (2d Dep't 1981).

■■■ In the instant case, the terms to be interpreted are "*all* expenses legal *or otherwise.*" The court believes that this broad language is sufficiently clear to manifest the intent of the parties to remove this term from the technical meaning of court fees which defendant now urges upon the court. It is true, as defendant argues, that plaintiffs could have used the terms "counsel fees" or "attorneys' fees." Yet, the terms "*all* expenses legal or otherwise" are sufficiently clear so that reasonable persons would believe the terms included attorneys' fees.

The court finds that the language used is sufficiently clear and unambiguous to express the intent of the parties, at the time that the contract was made, to provide for the reimbursement of plaintiffs' attorneys' fees in the event of litigation. *Cf. Tartell v. Chelsea National Bank*, 351 F.Supp. 1071, 1079 n. 5 (S.D.N.Y.) (holding that terms "all expenses (including expense for legal services of every kind)" sufficient to warrant award of attorneys' fee), *aff'd,* 470 F.2d 994 (2d Cir.1972). The court holds that under the loan agreement plaintiffs are entitled to collect their attorneys' fees and disbursements, and costs.[29] The court turns now to a determination of these sums.

Plaintiffs have submitted a detailed affidavit of legal services, setting forth the names of attorneys, the hours expended, the dates, and the nature of the work done.[30] During the course of this litigation, the hours expended by partners, associates, and summer associates total approximately 4,316 hours.[31] In addition, the hours expended by paraprofessionals and court clerks total approximately 180 hours.[32] Multiplying the total hours expended by the applicable rates, plaintiffs arrive at a lode-

**29.** Defendant also argues that under the terms of the note, Banco Nacional is required only to reimburse the legal and other expenses incurred by the "Bank" and that "Bank" is a defined term which refers to the particular plaintiff issuing the promissory note. Since the requested expenses were incurred by Libra Bank, the agent, so the argument continues, they are not reimbursable. The court notes that Libra Bank is the authorized agent of the plaintiff banks, Loan Agreement at 1, and that Libra Bank had the authority to bind each plaintiff to pay for legal services which Libra Bank procured on its behalf and for its benefit. Under these circumstances, it can hardly be said that expenses incurred by Libra Bank, as agent, are not expenses incurred by its principal, each bank named in each promissory note. *See generally, Restatement (Second) of Agency* at §§ 140, 144 (1957); *see also Columbia Broadcasting System, Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 376 (2d Cir.1975) (in reversing summary judgment by district court, Second Circuit stated that "there were disputed facts which, if found in CBS's favor, tend to show an agency relation between Stokely and Lenne and the latter's authority to bind the former to pay for advertising procured for the former's account and its benefit.").

**30.** Revised Affidavit of Jerry J. Strochlic in Support of Fee Application (Strochlic Affidavit).

**31.** Strochlic Affidavit at ¶ 6.

**32.** *Id.*

star figure of $531,500. Added to this sum is the sum of $48,418 representing disbursements. In addition, plaintiffs also seek other expenses including sheriff's fees, telex charges, attachment bond premiums, telephone charges, etc.,[33] totalling $69,964. All told, legal fees, disbursements, and costs total $649,882.

The standards governing fee applications were set forth in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469–70 (2d Cir.1974) (*Grinnell I*) and *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098–1103 (2d Cir. 1977) (*Grinnell II*); *accord, Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976), and updated guidelines were recently announced by the Second Circuit in *New York Association for Retarded Children, Inc., et al. v. Carey,* 711 F.2d 1136 at 1154 (2d Cir.1983) ("All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, for any work done after the date of this opinion should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done.").

Although the *Grinnell* cases established the lodestar concept in the context of class actions, it "has been generally accepted in fee application proceedings." *Koyen v. Consolidated Edison Co. of New York, Inc.,* 560 F.Supp. 1161, 1170 (S.D.N.Y.1983) (Weinfeld, J.). As Judge Weinfeld has noted, however,

> [t]he concept, based upon time expended, may lead to exaggerated claims for the value of services. If accepted without scrutiny, it may reward the inefficient and incompetent and penalize the efficient and competent. Thus a lawyer who is [knowledgeable] and experienced in a particular discipline of law may spend half the time required by a less experienced lawyer and in end result the inexperienced lawyer would receive twice the fee allowed to the other, assuming of

course each requested the same hourly rate.

*Id.* (footnotes omitted). *See Steinberg v. Carey,* 470 F.Supp. 471, 479 (S.D.N.Y.1979) (court awarded $250,000 after $325,000 request noting that time factor must bear a reasonable relationship to what is required to further claims asserted and court is justified in relying on its own experience as well as its knowledge of events in particular case); *Boe v. Colello,* 447 F.Supp. 607, 610 (S.D.N.Y.1978) (court may use its experience to estimate time reasonably required in terms of research, analysis, and drafting of respective documents); *Blank v. Talley Industries, Inc.,* 390 F.Supp. 1, 4 (S.D.N.Y. 1975) (scaling down claimed hours by 10% and otherwise reducing a requested fee of $3,055,000 to $1,395,600 noting that "[u]ndoubtedly, parties to a litigation may fashion it according to their purse and indulge themselves and their attorneys, but they may not foist their extravagances upon their unsuccessful adversaries") (citation omitted); *Levin v. Mississippi River Corporation,* 377 F.Supp. 926, 931 (S.D.N. Y.), *aff'd on opinion below,* 508 F.2d 836 (2d Cir.1974), *cert. denied, sub nom. Gabriel et al. v. Levin et al.,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

■ Courts have recognized that in assessing a fee application in cases, such as the present one, involving voluminous files, the trial court need not review and rule upon every entry in an application but may make percentage reductions of the claimed work hours expended. *See New York Association for Retarded Children, Inc. et al. v. Carey,* 711 F.2d 1136 at 1145 (2d Cir.1983); *Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1981) ("It is neither practical nor desirable to expect the trial court judge to have reviewed each paper in this massive case file to decide, for example, whether a particular motion could have been done in 9.6 hours instead of 14.3 hours."); *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, 641 (6th Cir. 1979) (a 5% reduction factor), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862

---

**33.** Apparently, these costs fall into the "other" expenses category.

(1980); *Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950,* 517 F.2d 1275, 1289, 1291 (D.C.Cir. 1975) (*en banc*) (affirming the district court's 30% reduction of hours worked and stating that fundamental principle guiding review is that court of appeals must pay "considerable deference to the District Court's exercise of equitable discretion in setting the fees"); *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1055–58 (S.D. N.Y.1977) (20% reduction), *aff'd without opinion,* 578 F.2d 1368 (2d Cir.1978); *see also Green v. Transitron Electronic Corporation,* 326 F.2d 492, 496 (1st Cir.1964).

 In the instant case, a perusal of plaintiffs' fee application reveals instances of time generously expended and matters generously staffed. The court does not, of course, question the competence of plaintiffs' counsel. To the contrary, plaintiffs' counsel have conducted this litigation at all times in a most able and competent professional manner. Nevertheless, the court must still determine a fair and reasonable fee for services reasonably necessary in furtherance of the clients' needs. Thus, in connection with a request for oral argument on a motion involved in this case, a partner in plaintiffs' law firm spent three hours in coming to chambers and making the application personally.[34] Billed at his hourly rate, the request for oral argument cost $450. Despite the perceived urgency of the request, such a request could have been made by telephone or by a less senior lawyer. At any rate, the cost for that simple arrangement and the means used to secure it are far in excess of what was reasonably required. *See Koyen v. Consolidated Edison Co. of New York, Inc.,* 560 F.Supp. at 1171 ("one may not indulge in the luxurious practice of law at the expense of the other side") (footnote omitted); *see also Steinberg v. Carey,* 470 F.Supp. at 479 and cases cited therein at nn. 36 & 37 (Weinfeld, J.) ("Courts in this Circuit and others have long admonished that lower rates should be charged for relatively administrative or non-legal work than for matters requiring a higher degree of professional skill. Similarly, time spent in travelling to and from conferences, court appearances ... should not be billed at the higher rate.").

 After Banco Nacional defaulted in the state court proceedings in connection with this action, plaintiffs prepared a default judgment in compliance with the Foreign Sovereign Immunities Act. The matter of preparing the judgment was staffed with four partners, four associates, and a paraprofessional at a cost of almost $8,000.[35] At the hearing on these matters, counsel did explain that, unlike defendant's counsel, it did not have substantial familiarity with the issues raised in this action.[36] In such circumstances, to proceed with reasonable caution in dealing with an intricate area of law and with the FSIA is commendable, but the question remains what is a fair fee which defendant must reimburse. A fee of $8,000 for the preparation of a default judgment is excessive. There are other instances of time generously expended,[37] and no useful purpose would be served by a line-by-line analysis.

On the other hand, this litigation involves a number of novel and complex issues. *See Grinnell I,* 495 F.2d at 471. For example,

---

**34.** Strochlic Affidavit at ¶ 32.

**35.** *Id.* at ¶ 27.

**36.** 4/20/83 Tr. at 40.

**37.** Preparation, translation, and service of the order to show cause why an attachment should not be entered cost over $7,000. *See* Strochlic Affidavit at ¶ 23.

Preparation, service, and filing of the complaint in the state court was staffed by three partners, four associates, and two paraprofessionals at a cost of nearly $8,500. *Id.* at ¶ 29.

In addition, a number of other charges seem improper. Plaintiffs researched Banco Nacional's motion to dismiss for lack of proper service under the FSIA at the cost of over $3,000 only to avoid litigation of the issue by reservice. *Id.* at ¶ 38.

The court also notes that Libra Bank charges defendant with legal fees for research into the possibility of suing *other* entities in addition to Banco Nacional. *Id.* at ¶ 17. This charge, for services unrelated to this lawsuit, is disallowed.

plaintiffs successfully urged a then novel view of the requirements of explicit waiver to prejudgment attachment under the FSIA. · That view was adopted by the Court of Appeals, *see Libra Bank Limited, et al. v. Banco Nacional de Costa Rica, S.A.,* 676 F.2d 47, 50 (2d Cir.1982), and its scope is still being defined, *see S & S Machinery Co. v. Masinexportimport,* 706 F.2d 411 (2d Cir. 1983). Additionally, plaintiffs have prevailed on the major issues considered in this opinion and have won a judgment for a considerable amount of money, plus interest, for their clients.

■■■ Based on the foregoing and the court's experience on the bench as well as its careful observation of the attorneys in this matter over the extended course of this litigation, and the quality of the legal work, the court believes that a sum of $425,200 for attorneys' fees is appropriate. This is a reduction of 20% from the $531,500 requested by plaintiffs and is referable to the overstaffing examples which were given above. The sums of $43,953 for disbursements and $67,255 for costs, which represent the deduction of duplicative and excessive charges from the amounts requested, are fair and reasonable in light of all the factors considered.[38]

## CONCLUSIONS

Plaintiffs' motion for summary judgment is granted but the motion for an order compelling defendant to return its assets is denied. The judgment is to be calculated according to the terms set forth in this opinion.[39]

Submit judgment on two days' notice by no later than July ——————, 1983.

## MEMORANDUM OPINION AND ORDER

This court's opinion and order of July 11, 1983 granted plaintiffs' motion for summary judgment. On July 15, 1983, the date this court was prepared to enter judgment in this case, defendant Banco Nacional de Costa Rica, S.A. (Banco Nacional) moved to reargue the motion. In its July 11, 1983 opinion, this court held that since the act of state doctrine was inapplicable to this case, this court would give no effect to the Costa Rican decrees because "they [were not] consistent with the policy and law of the United States." *Republic of Iraq v. First National City Bank,* 353 F.2d 47, 51 (2d Cir. 1965) (Friendly, J.), *cert. denied,* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). Defendant now contends that the nonenforcement of the loan agreement is consistent with the policies and laws of this nation as evidenced by Article VIII, section 2(b) of the Articles of Agreement of the International Monetary Fund (the Bretton Woods Agreement or the Agreement), Dec. 27, 1945, 60 Stat. 1401, T.I.A.S. No. 1502, 2 U.N.T.S. 39, *amended by* 20 U.S.T. 2775, T.I.A.S. No. 6748, 726 U.N.T.S. 266 (May 31, 1968), *amended by* 29 U.S.T. 2203, T.I.A.S. No. 8937, —— U.N.T.S. —— (April 30, 1978).[1] After considering the briefs of the

---

**38.** An expense for the premium on the attachment bond is charged twice to Banco Nacional. *Cf.* Miskin Affidavit at 8 and Strochlic Affidavit at 5. Banco Nacional paid $2,095 as requested by Libra Bank, in connection with the appeal to the Second Circuit. *See* Exhibit E annexed to Defendant's Memorandum in Support of Proposed Judgment. Libra Bank now wishes to charge Banco Nacional with an additional $2,709. That charge is disallowed.

**39.** Plaintiffs also request this court to retain jurisdiction over the judgment should they encounter further costs and expenses in its enforcement. The court declines to do so.

Finally, at an early point in this litigation defendant asserted a counterclaim for wrongful attachment. *See* Defendant's Second Amended Answer and Counterclaim at ¶¶ 33–40. Given

the Second Circuit's ruling that Banco Nacional waived its immunity to pre-judgment attachment, *see* 676 F.2d at 50, the claim is moot and therefore dismissed.

**1.** Although defendant styles this as a motion "to reargue," the court notes that this argument, based upon the Bretton Woods Agreement, is actually distinct from the arguments based upon the act of state doctrine and is raised here for the first time. Article VIII, section 2(b) has been enacted into law by 22 U.S.C. § 286h (1976) ("[T]he first sentence of Article VIII, section 2(b) ... shall have full force and effect in the United States....."). The argument that the nonenforcement of the loan agreement is dictated by a positive law of this nation is entirely distinct from the argument that a doctrine of judicial abstention bars

parties on this newly raised question of law, the court reaffirms its decision granting plaintiffs' motion for summary judgment and denies defendant's motion to reargue.

Article VIII, section 2(b) of the Bretton Woods Agreement provides:

Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member.[2]

Defendant contends that both the United States and Costa Rica are signatories of the Agreement, that each element of Article VIII, section 2(b) is present in this case, and that the loan agreement is unenforceable.

By definition, Article VIII, section 2(b) applies only to "exchange contracts." Relying primarily upon the views of a commentator, defendant urges this court to adopt a broad definition of these terms, sufficiently expansive to include international loans. *See* Williams, *Extraterritorial Enforcement of Exchange Control Regulations Under the International Monetary Fund Agreement,* 15 Va.J. Int'l Law 319, 338 (1975) (Williams). However, Williams himself acknowledges that he advocates a broad interpretation of the terms and that "[n]o American decision unequivocally supports a liberal interpretation of the term 'exchange contract.'" *Id.* at 342.

The broad and narrow interpretations of "exchange contracts" are set forth by a leading commentator as follows:

The narrow view of "exchange contracts" in Article VIII, Section 2(b) is that they are contracts for the exchange of one currency against another or one means of payment against another. The broad view is that they are contracts involving monetary elements.

J. Gold, *The Fund Agreement in the Courts: Volume II* 425 (1982) (Gold). A review of the decisions that have directly addressed the meaning of these terms reveals that they consistently adhere to the narrow interpretation of the terms "exchange contracts."

In *Banco Do Brasil, S.A. v. A.C. Israel Commodity Co. Inc.,* 12 N.Y.2d 371, 190 N.E.2d 235, 239 N.Y.S.2d 872 (1963), *cert. denied,* 376 U.S. 906, 84 S.Ct. 657, 11 L.Ed.2d 605 (1964), the Court of Appeals endorsed a narrow view of the terms "exchange contracts" as contracts which have as their immediate object the exchange of international media of payment, *viz.* the exchange of one currency for another:

It is far from clear whether this sale of coffee is covered by subdivision (b) of section 2. . . . Subdivision (b) of section 2 has been construed as reaching only "transactions which have as their immediate object 'exchange,' that is, international media of payment" . . ., or a contract where the consideration is payable in the currency of the country whose exchange controls are violated . . . . More recently, however, it has been suggested that it applies to "contracts which in any way affect a country's exchange resources" . . . . A similar view has been advanced to explain the further textual difficulty existing with respect to whether a sale of coffee in New York for American dollars "involves the currency" of Brazil, the member whose exchange controls were allegedly violated. Again

---

review of the decrees. Courts which have been confronted with both arguments view and treat them as entirely discrete arguments. *See Weston Banking Corp. v. Turkiye Garanti Bankasi,* 57 N.Y.2d 315, 442 N.E.2d 1195, 456 N.Y.S.2d 684 (1982); *J. Zeevi & Sons v. Grindlays Bank (Uganda), Limited,* 37 N.Y.2d 220, 333 N.E.2d 168, 371 N.Y.S.2d 892, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). A commentator has also argued that Article VIII, section 2(b) supersedes the act of state doctrine. *See* Williams, *Extraterritorial Enforcement of Exchange Control Regulations Under*

*the International Monetary Fund Agreement,* 15 Va.J. Int'l Law 319, 387–94 (1975).

**2.** Unless otherwise indicated, all references to the Bretton Woods Agreement may be found in International Monetary Fund, *Articles of Agreement of the International Monetary Fund* (1982). The first sentence of Article VIII, section 2(b) has been enacted into positive law by section 286h of the Bretton Woods Agreement Act. *See* 22 U.S.C. § 286h (1976).

it is suggested that adverse effect on the exchange resources of a member *ipso facto* "involves" the "currency" of that member .... *We are inclined to view an interpretation of subdivision (b) of section 2 that sweeps in all contracts affecting any members' exchange resources as doing considerable violence to the text of the section. It says "involve the currency" of the country whose exchange controls are violated; not "involve the exchange resources".*

12 N.Y.2d at 375–76, 190 N.E.2d at 236, 239 N.Y.S.2d at 873–74 (emphasis added; citations omitted).

In *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Limited,* 37 N.Y.2d 220, 333 N.E.2d 168, 371 N.Y.S.2d 892 (*Zeevi*), cert. denied, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975) the Court of Appeals adhered to its narrow interpretation of the terms "exchange contracts." On March 24, 1972, Hiram Zeevi & Company (Uganda) Ltd., an Israeli corporation, deposited with defendant Grindlays Bank (Uganda) Ltd., local currency valued at $406,864.80 in American dollars. The purpose of the deposit was to provide an account against which plaintiff J. Zeevi & Sons, Ltd., a partnership, could draw money. Defendant subsequently issued a letter of credit acknowledging that it had opened its irrevocable credit No. 110/84 for $406,846.80 in favor of the partnership.

By official directive, the Uganda government subsequently notified defendant that foreign exchange allocations in favor of Israeli companies and nationals should be cancelled and ordered defendant to make no foreign exchange payments pursuant to the letter of credit. Thereafter, when plaintiff presented for reimbursement 10 drafts drawn under the letter of credit at defendant's New York agent bank, the bank refused to honor the drafts. Plaintiffs brought suit. The Supreme Court held that the letter of credit was enforceable and granted plaintiff's motion for partial summary judgment. The Appellate Division affirmed.

On appeal, the Court of Appeals affirmed the lower courts and specifically rejected defendant's contention that enforcement of the letter of credit violated Article VIII, section 2(b) of the Bretton Woods Agreement. Judge Cooke held:

Contrary to defendants' position, the agreement, even when read in its broadest sense, fails to bring the letter of credit within its scope, since said letter of credit is not an exchange contract. In *Banco Do Brasil, S.A. v. Israel Commodity Co.,* 12 N.Y.2d 371, 375–376, 239 N.Y. S.2d 872, 874, 190 N.E.2d 235, 236, this court frowned on an interpretation of said provision of the Bretton Woods Agreement which "sweeps in all contracts affecting any members' exchange resources as doing considerable violence to the text of the section".

37 N.Y.2d at 229, 333 N.E.2d at 174, 371 N.Y.S.2d at 900. *Cf. Weston Banking Corp. v. Turkiye Garanti Bankasi,* 57 N.Y.2d 315, 332–34 & nn. 5–6, 442 N.E.2d 1195, 1203–04 & nn. 5–6, 456 N.Y.S.2d 684, 692–93 & nn. 5–6 (1982) (Jasen, J., dissenting).

Other cases that have squarely addressed the issue also adhere to a narrow interpretation of the terms "exchange contracts." *See Theye y Ajuria v. Pan American Life Insurance Co.,* 245 La. 755, 161 So.2d 70, 74 ("a contract payable in the state of Louisiana in United States currency is not a foreign exchange contract") (*Theye*), cert. denied, 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046, reh'g denied, 379 U.S. 872, 85 S.Ct. 20, 13 L.Ed.2d 79 (1964); *Pan American Life Insurance Co. v. Raij,* 156 So.2d 785, 786. (Fla.Dist.Ct.App.1963) ("an American contract ... to or by the appellant in United States currency, [is] not an unenforceable contract within the provisions of Article VIII, § 2(b) of the Bretton Woods Agreement") (footnote omitted), cert. denied, 379 U.S. 920, 85 S.Ct. 275, 13 L.Ed.2d 334 (1964).[3] *See also* Nussbaum, *Exchange*

---

**3.** Although the definition of an "exchange contract" is crucial, the Bretton Woods Agreement provides no definition of those terms. Moreover, careful research has disclosed only a handful of cases, all discussed in this opinion, that have addressed the issue.

*Control and the International Monetary Fund,* 59 Yale L.J. 421, 428 & n. 34 (1950).

The authorities relied upon by defendant do not persuade this court to adopt a broad interpretation of the terms "exchange contracts." [4] The advocates of the broad view in this nation are primarily commentators. *See* Gold, *supra,* at 92; Williams, *supra,* at 337–44; Meyer, *Recognition of Exchange Controls After the International Monetary Fund Agreement,* 62 Yale L.J. 867, 885–88 (1953). At least one commentator, in urging the broad view, argues that the term "exchange" should be deleted from Article VIII, section 2(b). *See* Williams, *supra,* at 395 (suggesting the terms "exchange" and "involve the currency" be deleted from Article VIII, section 2(b) in order to "establish that a broad interpretation of this provision is correct . . ."). As the provision is presently written, however, a broad interpretation of *"exchange* contracts," sufficiently expansive to include international loans, does violence to the text of the section. *See* 33 C.J.S. § 1(b) (1942) ("The word exchange is generally regarded as synonymous with barter, swap, or trade and it is distinguishable from compromise, lease, or *loan.")* (emphasis added). *See also* Black's Law Dictionary 505 (5th ed. 1979) (defining exchange to mean "[t]o barter; swap. To part with, give or transfer for an equivalent."); Ballentine's Law Dictionary 428 (3d ed. 1969) (defining exchange as "[a]n ex-

---

4. Defendant relies primarily upon the view of a single commentator who defines an exchange contract to include "international loan agreements." Williams, *Extraterritorial Enforcement of Exchange Control Regulations Under the International Monetary Fund Agreement,* 15 Va.J. Int'l L. 319, 338 (1975). However, the commentator himself acknowledges that this broad interpretation has never been "unequivocally" supported by an American court, *id.* at 342, and has been explicitly rejected by the New York courts. *Id.* at 335. Indeed, the broad interpretation has been advocated in the United States only by commentators. *See id.* at 344; Gold, *The Fund Agreement in the Courts: Volume II* at 92 (1982); Meyer, *Recognition of Exchange Controls After the International Monetary Fund Agreement,* 62 Yale L.J. 867, 886 (1953).

Defendant also cites three New York cases to support this broad interpretation. A careful examination of these cases demonstrates that they do not directly support defendant's position. In *Brill v. Chase Manhattan Bank,* 14 A.D.2d 852, 220 N.Y.S.2d 903 (1st Dep't 1961), two dissenting judges argued that a check issued by a bank in Cuba for a deposit in pesos was, if payable in United States currency, an exchange contract. *Id.* at 852, 220 N.Y.S.2d at 904 (Botein & Stever, JJ., dissenting in part). However, the argument of the dissenting judges supports the narrow interpretation because it interpreted the check to be an exchange contract if the object of the contract were to exchange one nation's currency for that of another. Indeed, the dissent has been cited by Williams as support for the narrow interpretation. *See* Williams, *supra,* at 334 n. 65.

Neither does *Southwestern Shipping Corp. v. National City Bank,* 11 Misc.2d 397, 173 N.Y. S.2d 509 (Sup.Ct.) (*Southwestern*), aff'd, 6 A.D.2d 1036, 178 N.Y.S.2d 1019 (1st Dep't 1958), *rev'd on other grounds,* 6 N.Y.2d 454, 160 N.E.2d 836, 190 N.Y.S.2d 352, *cert. denied,* 361 U.S. 895, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959) support the narrow interpretation. *Southwestern* involved not a loan but an exchange of lire for dollars, which is clearly within the narrow view of "exchange contracts."

Furthermore, although the court did find that the Bretton Woods Agreement barred enforcement, the court did so without any discussion of the terms "exchange contracts." Moreover, the court also focused on the illegality *ab initio* of the contract and stated that even in the absence of the Bretton Woods Agreement, it would not enforce an illegal contract. 11 Misc.2d at 411, 173 N.Y.S.2d at 523.

The final case, *Perutz v. Bohemian Discount Bank in Liquidation,* 304 N.Y. 533, 110 N.E.2d 6 (1953) (*Perutz*) also gives no support to defendant's position. In *Perutz,* a Czechoslovakian who became a United States citizen sued to recover his pension from his former employer, a Czechoslovakian banking corporation. Czechoslovakian law prohibited payment in foreign currency to a non-resident. The court held that the Bretton Woods Agreement barred enforcement of the payment of the pension in this nation in United States currency. 304 N.Y. at 537, 110 N.E.2d at 7–8. However, as in *Southwestern,* the *Perutz* court did not discuss the interpretation of "exchange contracts." Moreover, a leading advocate of the broad interpretation of "exchange contracts" has stated that the *ratio decendi* of *Perutz* is "obscure," Gold, *supra,* at 30, and "not clear." *Id.* at 200. Under these circumstances, *Perutz* is hardly persuasive authority for the broad interpretation.

Finally, these cases are all at least twenty years old and would appear to be superseded, insofar as they express contrary views, by the Court of Appeals' ruling in the *Zeevi* case.

change of the money of one country for the money of another at a rate which depends upon the respective values of the two currencies in the money markets of the world.").

The court declines to depart from the interpretation of exchange contracts consistently propounded by the courts that have directly addressed the issue. The court holds that a contract to borrow United States currency, which requires repayment in United States currency, and which designates New York as the situs of repayment, is not an exchange contract within the meaning of Article VIII, section 2(b).[5] The Bretton Woods Agreement is therefore inapplicable to this case.

Moreover, assuming *arguendo* that the loan agreement is an exchange contract, defendant has submitted no authority for its view that a contract, valid and enforceable when made, may be rendered unenforceable by an intervening currency regulation. Indeed, there is authority in support of the contrary view. *See Blanco v. Pan-American Life Insurance Company,* 221 F.Supp. 219, 229 (S.D.Fla.1963) ("[T]hese [foreign currency regulations] do not apply to cover the situation of a Cuban national enforcing an executory contract in the forum of another jurisdiction according to the terms of an obligation existing prior to the passage of those laws."), *aff'd on other grounds,* 362 F.2d 167, 171 (5th Cir.1966) (holding that because Cuba had since withdrawn from International Monetary Fund, Cuba was no longer entitled to protection of Agreement but also noted that "[e]ven if this were not so, the Bretton Woods Agreement would not be applicable to contracts such as the insurance policies here involved."); *Theye,* 161 So.2d at 72–73 (in reversing lower court that gave effect to intervening currency regulations under Bretton Woods Agreement, court held that where currency regulations permitted payment in United States currency at time insurance policy was executed, subsequent currency regulation requiring repayment in pesos had no effect on existing obligation); *see also* F. Mann, *The Legal Aspect of Money* 377–78 (4th ed. 1982) ("In short, Art. VIII(2)(b) gives international recognition to the original ineffectiveness of an exchange contract, but does not touch a contract which during its life [becomes] an exchange contract contrary to regulations."); *but see* Gold, *supra,* at 91–92; Williams, *supra,* at 364–67.[6]

---

5. Research has disclosed only one case that could be viewed as contra to this narrow interpretation of exchange contracts. In *Confederation Life Association v. Ugalde,* 164 So.2d 1 (S.Ct.Fla.), *cert. denied,* 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964), the Florida Supreme Court ruled that an insurance contract issued to a Cuban resident fell within the scope of the Articles of the International Monetary Fund. 164 So.2d at 2. The insurance policy was unenforceable under Cuban law and the Florida court refused to enforce it in the United States. In *Ugalde,* however, the policy was payable in Cuba itself, not in the United States. *Id.* In the instant case, payment is due in the United States not in Costa Rica. Furthermore, the *Ugalde* court reached its conclusion of unenforceability in a single paragraph without any reference to or discussion of the terms "exchange contracts" or Article VIII, section 2(b). Two later Florida cases following *Ugalde* were summarily decided relying solely upon that case and contained no discussion of Article VIII, section 2(b). *See Crown Life Insurance Co. v. Calvo,* 164 So.2d 813 (S.Ct.Fla.), *cert. denied,* 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964); *Sun Life Assurance Co. v. Klawans,* 165 So.2d 166 (S.Ct.Fla.1964).

These cases, decided almost twenty years ago in the context of insurance policies, appear to be the only judicial authority for an expansive reading of Article VIII, section 2(b). For the reasons already discussed, however, the court finds them unpersuasive and declines to follow them.

6. The International Monetary Fund's official interpretation of Article VIII, Section 2(b) reads in relevant part:

Parties entering into exchange contracts involving the currency of any member of the Fund and contrary to exchange control regulations of that member which are maintained or imposed consistently with the Fund Agreement will not receive the assistance of the judicial or administrative authorities of other members in obtaining the performance of such contracts.

14 M. Whiteman, *Digest of International Law* 555 (1970) (quoting International Monetary Fund, Annual Report, 1949 at 82–83). The phrase "parties entering into exchange contracts ... contrary to exchange control regulations" suggests that Article VIII, section 2(b) applies only when the contract is illegal *ab*

■ Finally, this court concludes that defendant has not demonstrated that these currency regulations are "maintained or imposed consistently with [the Fund] Agreement . . . ." In its attempt to discharge this burden, defendant makes the bland assertion that

[t]he decrees of the Costa Rican government are imposed and maintained "consistently" with the Bretton Woods Agreement inasmuch as they fulfill the purposes of the Agreement, namely, to promote exchange stability and to maintain orderly arrangements among members of Bretton Woods.[7]

About the task of demonstrating consistency, a leading commentator has written:

[A] defendant who relies on Article VIII, Section 2(b) necessarily asserts that exchange controls are maintained or imposed consistently with the Articles, and he should have the burden of proving this fact.

Gold, *supra*, at 334; *see also id.* at 358 (urging that in determining consistency the "only safe course is to seek the advice of the [International Monetary] Fund."); *see also* 14 M. Whiteman, *Digest of International Law* 556 (1970) ("[T]he Fund is prepared to advise whether particular exchange control regulations are maintained or imposed consistently with the Fund Agreement.") (quoting International Monetary Fund, Annual Report, 1949, at 82–83).

A careful examination of the Articles of Agreement of the International Monetary Fund demonstrates that defendant's simple statement hardly suffices to demonstrate consistency with the Fund Agreement.

Article VIII, section 2(a) provides:

(a) Subject to the provisions of Article VII, Section 3(b) and Article XIV, Section 2, no member shall, without the approval of the Fund, impose restrictions on the making of payments and transfers for current international transactions.[8]

Article XXX defines "current transactions" as follows:

(d) *Payments for current transactions means payments which are not for the purpose of transferring capital, and includes,* without limitation:

(1) *all payments due in connection with* foreign trade, other current business, including services, and *normal short-term banking and credit facilities;*

(2) *payments due as interest on loans* and as net income from other investments;

(3) payments of moderate amount for amortization of loans or for depreciation of direct investments; and

(4) moderate remittances for family living expenses.

The Fund may, after consultation with the members concerned, determine whether certain specific transactions are to be considered current transactions or capital transactions. (Emphasis added.)

The distinction between current or capital transactions can be a crucial one since a member of the International Monetary

---

*initio.* Although leading commentators such as Gold believe that regulations which retroactively render exchange contracts unenforceable do not pose a problem, *see* Gold at 92, this court is not persuaded on the basis of these arguments alone that Article VIII, section 2(b) applies to currency regulations which retroactively render contracts unenforceable.

7. Defendant's Memorandum in Support of Motion to Reargue at 11.

8. Article VII, section 3(b) provides in pertinent part:

(b) A formal declaration [by the Fund] under (a) above shall operate as an authorization to any member, after consultation with the Fund, temporarily to impose limitations on the freedom of exchange operations in the scarce currency.

Article XIV, section 2 provides in pertinent part:

Section 2. *Exchange restrictions*

A member that has notified the Fund that it intends to avail itself of transitional arrangements under this provision may, notwithstanding the provisions of any other articles of this Agreement, maintain and adapt to changing circumstances the restrictions on payments and transfers for current international transactions that were in effect on the date on which it became a member.

Defendant has made no attempt to demonstrate that it has complied with these provisions.

Fund (the Fund) is free to impose restrictions on capital transactions without the approval of the Fund. Article VI, section 3 provides:

Section 3. *Controls of capital transfers*

Members may exercise such controls as are necessary to regulate international capital movements, but no member may exercise these controls in a manner which will restrict payments for current transactions or which will unduly delay transfers of funds in settlement of commitments, except as provided in Article VII, Section 3(b) and in Article XIV, Section 2.[9]

With these provisions in mind, the court concludes that a showing that these currency restrictions are maintained or imposed consistently with the Fund includes the following: defendant may show that it has obtained Fund approval for these restrictions. Alternatively, defendant may demonstrate that these are restrictions upon capital as opposed to current transactions and that the Fund's approval is therefore unnecessary. Defendant has failed to sustain its burden by accomplishing either task, and its bland assertion alone does not suffice to discharge its burden. *Cf. Blanco,* 221 F.Supp. 219, 224–25 (submitting an official statement of the Fund with respect to regulations consistent with the Fund Agreement); *Southwestern Shipping Corp. v. National City Bank,* 11 Misc.2d 397, 410, 173 N.Y.S.2d 509, 523 (Sup.Ct.) (official Fund statement about currency regulations), *aff'd,* 6 A.D.2d 1036, 178 N.Y.S.2d 1019 (1st Dep't 1958), *rev'd on other grounds,* 6 N.Y.2d 454, 160 N.E.2d 836, 190 N.Y.S.2d 352, *cert. denied,* 361 U.S. 895, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959).

*Conclusions*

The court concludes that this loan agreement is not an exchange contract and that the Bretton Woods Agreement is inapplicable. Assuming *arguendo* that the loan agreement is an exchange contract, defendant has not persuaded this court that an intervening change in foreign currency regulations rendering a contract unenforceable is within the scope of Article VIII, section 2(b). Finally, defendant has not demonstrated that these currency regulations were imposed consistently with the Fund Agreement.

After considering defendant's newly raised arguments on their merits, the court declines to alter its previous ruling granting plaintiffs' motion for summary judgment and denies the motion to reargue.

Settle and submit a final judgment with notice by no later than 12:00 a.m. on August 16, 1983.

---

**9.** For the relevant text of Article VII, section 3(b) and Article XIV, section 2, *see* note 8, *supra.*